IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

VERIZON VIRGINIA, LLC,
et al.,

     Plaintiffs,

v.                                    Civil Action No. 3:15-cv-171

XO COMMUNICATIONS, LLC
et al.,

     Defendants.

**MEMORANDUM OPINION**

This matter is before the Court on PLAINTIFFS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS (Docket No. 40), which the Court subsequently converted into a MOTION FOR PARTIAL SUMMARY JUDGMENT at the joint request of the parties (Order, Docket No. 67). For the reasons stated below, the Court finds for the Plaintiffs with regard to the "Calculation Dispute" and finds for the Defendants with regard to the "3-Month Dispute." Relying on the parties' stipulation on damages (Stipulation, Docket No. 69), the Court awards Verizon $2,711,989.

**BACKGROUND**

**A.    Procedural Posture**

Plaintiffs are fourteen state or regional Verizon corporate entities (collectively, "Verizon"). Defendants are XO Communications, LLC and XO Virginia, LLC (collectively, "XO"). Plaintiffs filed in this Court on March 19, 2015, alleging several counts stemming from XO's failure to pay fees to Verizon owed under federal tariff schedules, intrastate tariff schedules, and federally-governed private contracts. (Compl. ¶¶ 1, 50, Docket No. 1; Am. Compl. ¶¶ 1, 50, Docket No. 70). The Complaint additionally alleges that XO failed to pay late fees on those non-payments. (Compl. ¶ 3; Am. Compl. ¶ 3).

The pending motion involves the largest dollar-value claim in the Complaint, the so-called Commitment Discount Plan ("CDP") claim. CDPs offer discounts to customers in exchange for a pre-commitment to buy high volumes of Verizon's pre-identified services. However, the CDPs also contain a "shortfall provision" that penalizes the customer's failure to meet those commitments. (Compl. ¶¶ 51-69; Am. Compl. ¶¶ 51-69). Verizon alleged that XO failed to meet its pre-commitments, and then failed to pay the shortfall fees and late payment fees associated with these shortfall fees. (Compl. ¶¶ 54-69; Am. Compl. ¶¶ 54-69).

2

On May 13, 2015, XO filed three motions, including a Motion to Refer Claims for Agency Resolution. (Docket No. 22) ("Motion to Refer"). On the same date, XO also filed its Answer, Affirmative Defenses, and Counterclaims. (Docket No. 25). In its Answer and Affirmative Defenses, XO claimed that Verizon had incorrectly interpreted the CDP shortfall fee, that Verizon had incorrectly calculated the CDP shortfall fee under Verizon's own interpretation, and that the CDP shortfall fee as interpreted by Verizon was unjust and unreasonable in contravention of the Telecommunications Act. (Answer ¶¶ 60-65; Affirmative Defenses ¶ 3). Verizon opposed all of XO's motions. (Docket No. 33).

On August 7, 2015, Verizon filed this Motion for Partial Judgment on the Pleadings requesting partial judgment on the CDP issue, along with a memorandum in support. (Pl.'s Mem. in Supp. for Partial J. on the Pleadings, Docket No. 41) ("Pl.'s Partial J. Mem."). XO filed its Memorandum in Opposition (Docket No. 44) ("Def.'s Partial J. Reply") on August 21, 2015, raising three main issues of law ((1) whether Verizon had correctly interpreted the tariff; (2) whether the tariff was just and reasonable under the Telecommunications Act; and (3) whether Verizon could bring a claim for a certain three-month period in addition to the usual six-month periods) and one issue of fact (whether Verizon had correctly applied its own formula).

3

On August 25, 2015, the Court denied the Motion to Refer. (Order, Docket No. 46). On August 31, 2015, XO informed the Court that it intended to present several CDP-related issues, including the "just and reasonable" nature of the CDP shortfall provision, to the Federal Communications Commission ("FCC"). (Letter, Docket No. 50). On August 31, Verizon filed a Motion for Temporary Restraining Order and Preliminary Injunction Pursuant to the All Writs Act (Docket No. 51) and a Memorandum in Support of that motion (Docket No. 52), requesting that XO be enjoined from bringing any CDP-related matter to the FCC. The Court ordered accelerated briefing (Order, Docket No. 53), and held a hearing on the matter on September 8, 2015.

At the September 8, 2015 hearing, before any ruling on the motion for an injunction, the parties agreed that, rather than continuing a battle over the appropriate forum, they would agree to an expedited ruling from the Court on the CDP claim by way of summary judgment. (Tr. Sep. 8, 2015 Hr'g, Docket No. 68, 52:9-55:2). To enable this expedited ruling, the parties advised that they would withdraw some of the live issues that had been raised in the briefing on Verizon's partial summary judgment motion: whether the CDP shortfall provision was just and reasonable, and whether Verizon correctly calculated the shortfall under its own interpretation of the tariff. (Tr. Sep. 8, 2015 Hr'g 52:9-55:2).

4

Subsequently, the parties requested, and the Court granted, a motion converting Verizon's Rule 12(c) motion to a Motion for Partial Summary Judgment under Rule 56. (Joint Proposed Order, Docket No. 66; Order, Docket No. 67).

On September 16, 2015, the parties filed their stipulation on CDP issues, narrowing the dispute to two issues:

1. "[H]ow to calculate the shortfall due under the tariffs in the event a customer … does not meet its minimum commitment. ('Calculation Dispute.')" (Stipulation ¶ 2).

2. "[W]hether XO owes a shortfall payment for the three-month period from July-September 2014. ('3-Month Dispute.')" (Stipulation ¶ 3).

The parties also stipulated as to the damages that should be entered depending on the resolution of each dispute. (Stipulation ¶ 4). In essence, the parties voluntarily submitted the merits of the CDP monetary claim to the Court for final resolution.

**B.   Claims at Issue**

Under the Telecommunications Act, Verizon must make its infrastructure available to other telecommunications companies pursuant to tariffed rates. 47 U.S.C. § 251. Two of Verizon's tariffs provide for CDPs. (Compl. ¶ 51; Am. Compl. ¶ 52); Verizon Telephone Companies Tariff FCC No. 1 ("FCC 1") § 25.1;

Verizon Telephone Companies Tariff FCC No. 11 ("FCC 11") §
25.1)). Under the CDP terms, a customer commits to purchase a
certain minimum number of "channel terminations" on a specified
service, in exchange for which Verizon gives that customer a
discount on all aspects of service (transport, termination,
multiplexers) that are required to provide the specified
service. (Compl. ¶¶ 51-57; Am. Compl. ¶¶ 51-57; Pl.'s Partial J.
Mem. 1-5; FCC 1 § 25.1; FCC 11 § 25.1). A customer that does not
purchase enough channel terminations to meet the minimum
commitment is subject to a shortfall penalty. (FCC 1 §
25.1.7(B); FCC 11 § 25.1.7(B); Pl.'s Partial J. Mem. 3-5).

Verizon alleges, and XO agrees, that XO began subscribing
to Verizon's CDPs in 2004. (Compl. ¶¶ 54, 57; Am. Compl. ¶¶ 54,
57; Answer ¶¶ 57-65). Verizon alleges, and XO agrees, that XO
missed several of its pre-commitments between 2012 and the
present, and that XO received but did not pay Verizon's bills
for the shortfall amounts. (Compl. ¶¶ 59-65; Am. Compl. ¶¶ 59-
65; Answer ¶¶ 57-65). In its Answer, XO denied that the CDP was
enforceable (on grounds that it was unjust and unreasonable in
contravention of the Telecommunications Act) and denied that
Verizon had correctly calculated the shortfall. (Answer ¶¶ 57-
65). The parties' subsequent Joint Submission reiterated that
the parties "dispute … how that shortfall adjustment should be

6

calculated." (Joint Submission, Docket No. 32, 1). After entry of the Stipulation, the parties' CDP disagreement has two components.[1]

The first dispute is interpretation of the shortfall provision, the "Calculation Dispute." (Stipulation ¶ 2). Verizon argues that its tariff is unambiguous, and that the shortfall must be calculated according to the five-step formula set forth in the tariff. (Pl.'s Reply to Resp. to Mtn. for J. on the Pleadings, Docket No. 45, 3-5) ("Pl.'s Partial J. Reply") (relying on FCC 1 § 25.1.7(B); FCC 11 § 25.1.7(B)). XO asserts that Verizon's tariff is ambiguous because, although the five-step formula calls for calculation based on what a customer actually spent, the preamble to that formula describes the penalty as the difference between what a customer spent over the last six months and what a customer "would have" spent over the last six months "had the minimum commitment been satisfied." (Def.'s Partial J. Reply 9). According to XO's theory, a rational business actor "would have" bought channel terminations (and only channel terminations) necessary to meet the minimum commitment, such that calculating the penalty using the preamble

---

[1] By agreement of the parties, the question whether the shortfall penalties are just and reasonable has been withdrawn by XO and will be presented to the FCC. (Order, Docket No. 67).

to the five-step formula creates a lower penalty than using the five-step formula itself. (Def.'s Partial J. Reply 10).

Thereupon, XO asserts that, because the preamble and the five-step formula are both plausible ways to calculate the shortfall, there is a patent ambiguity, and the Court must enforce the tariff according to the interpretation most favorable to the customer. (Def.'s Partial J. Reply 11-12). In the alternative, XO argues that, even if the Court does not believe that a rational actor "would have" purchased only sufficient channel terminations necessary to stave off the shortfall penalty, the term "would have" creates a latent ambiguity that entitles XO to present evidence on what its purchasing history and business needs show it "would have" spent, and that this factual issue precludes granting summary judgment. (Def.'s Partial J. Reply 14-16).

The second dispute concerns the application of the shortfall provision to a three-month period, the "3-Month Dispute." XO takes the veiw that Verizon cannot charge under the shortfall provision for the three-month period from June to September of 2014. (Def.'s Partial J. Reply 8-9). XO apparently first raised this issue in an August 14, 2015 letter to Verizon that was sent in anticipation of XO's proposed FCC filing. (XO's Partial J. Reply, Ex. 2). Verizon initially responded to that

8

letter in an August 21, 2015 letter to XO. (Pl.'s Partial J. Reply, Ex. 1). The argument first appeared in the court record as part of XO's reply to the pending motion. (Def.'s Partial J. Reply 8-9). Verizon first responded in the court record in its reply brief on the pending motion, arguing that the Custom Solutions Agreement ("CSA") extended the CDP, and that it is unreasonable to read the CSA as giving XO the CDP discount whether or not XO met the minimum commitments. (Pl.'s Partial J. Reply 7-8).

## LEGAL STANDARDS FOR A SUMMARY JUDGMENT MOTION

Verizon titled its pleading "Motion for Partial Judgment on the Pleadings Pursuant to FRCP 12(c)." Following the hearing of September 14, 2015, however, the parties requested entry of an order converting the motion into a Motion for Summary Judgment. (Joint Proposed Order, Docket No. 66; Order, Docket No. 67). Thus, upon agreement of the parties, Verizon's motion seeks summary judgment, and the Court is to decide these two issues on summary judgment.

Under Fed. R. Civ. P. 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

9

any material fact and that the moving party is entitled to judgment as a matter of law."

"Generally, on motions for summary judgment, courts regard stipulations of fact as admissions of the parties that are conclusive without further evidentiary support in the record." In re Durability Inc., 212 F.3d 551, 555 (10th Cir. 2000); Papandon v. U.S. ex rel. Perler, 350 F. App'x 491, 493 (2d Cir. 2009) ("stipulation between the parties was controlling" such that there was "no material issue of disputed fact with respect to the amount of" liability). See also Streeter v. SSOE Sys., Inc., 446 F. App'x 565, 566 (4th Cir. 2011) (unpublished) ("The court will uphold an award of summary judgment only if the moving party shows by citing to parts of the record … stipulations … or other materials that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.") (emphasis added); but cf. H&R Block E. Enters., Inc. v. Raskin, 591 F.3d 718 (4th Cir. 2010) (noting that parties cannot stipulate to questions of law); Synergistic Int'l, LLC v. Korman, 470 F.3d 162, 168 (4th Cir. 2006) (noting that parties cannot stipulate to legal conclusions).

Issues of contract and tariff interpretation are matters of law germane to resolution at the summary judgment stage.

> If a court properly determines that the
> contract is unambiguous on the dispositive
> issue, it may then properly interpret the
> contract as a matter of law and grant
> summary judgment because no interpretive
> facts are in genuine issue. Even where a
> court, however, determines as a matter of
> law that the contract is ambiguous, it may
> yet examine evidence extrinsic to the
> contract that is included in the summary
> judgment materials, and, if the evidence is,
> as a matter of law, dispositive of the
> interpretative issue, grant summary judgment
> on that basis.

Goodman v. Resolution Trust Corp., 7 F.3d 1123, 1126 (4th Cir.

1993); see also United States v. W. Pac. R. Co., 352 U.S. 59,

65-66 (1956) ("where the question is simply one of construction

[of a tariff] the courts may pass on it as an issue 'solely of

law.'") (internal citation omitted).

## PRINCIPLES OF TARIFF CONSTRUCTION

### A.   Ambiguity and Reformation in Tariff Interpretation

Contracts governed by federal law are interpreted according

to "federal common law rules of contract interpretation" that,

in turn, are guided by "principles of state common law." Johnson

v. Am. United Life Ins. Co., 716 F.3d 813, 819 (4th Cir. 2013).

Tariffs, too, are interpreted according to federal common law.

See, e.g., Penn Cent. Co. v. Gen. Mills, Inc., 439 F.2d 1338,

1340 (8th Cir. 1971) (cataloguing "certain well-established

rules of construction generally adhered to by the courts"); Ivy

11

Broad. Co. v. Am. Tel. & Tel. Co., 391 F.2d 486, 491 (2d Cir. 1968) ("Where neither the Communications Act itself nor the tariffs filed pursuant to the Act deals with a particular question, the courts are to apply a uniform rule of federal common law."). Tariff interpretation largely follows the rules of contract construction. Great N. Ry. Co. v. Merchants' Elevator Co., 259 U.S. 285, 291 (1922) ("what construction shall be given to a railroad tariff presents ordinarily a question of law which does not differ in character from those presented when the construction of any other document is in dispute.")[2]

As in the case of contract interpretation, e.g., Cent. Tel. Co. of Virginia v. Sprint Commc'ns Co. of Virginia, 759 F. Supp. 2d 789, 804 (E.D. Va. 2011), aff'd, 715 F.3d 501 (4th Cir.

---

[2] This general rule providing that tariffs should be interpreted in the same way as other documents is limited by the filed rate doctrine and the doctrine of primary jurisdiction, which create restrictions on a court's ability to reform tariff terms. E.g., Milne Truck Lines, Inc., 970 F.2d 564, 567 (9th Cir. 1992); Western Transp. Co. v. Wilson & Co., 682 F.2d 1227, 1231 (7th Cir.1982); Coca-Cola Co. v. Atchison, T. & S. F. Ry. Co., 608 F.2d 213, 219 (5th Cir. 1979). The relevant particulars of these limitations are discussed later in the opinion. However, these doctrines do not "preclude courts from interpreting the provisions of a tariff and enforcing that tariff." Brown v. MCI WorldCom Network Servs., Inc., 277 F.3d 1166, 1171-72 (9th Cir. 2002) (emphasis added); see also W. Pac. R. Co., 352 U.S. at 65-66.

2013), tariff ambiguity is construed against the drafter, which is always the carrier. As the Seventh Circuit has put it:

> [t]he tariff should be construed strictly against the carrier since the carrier drafted the tariff; and consequently, any ambiguity or doubt should be decided in favor of the [non-carrier]. Such ambiguity or doubt must be a reasonable one and should not be the result of a straining of the language....
>
> [T]ariffs ... should be interpreted in such a way as to avoid unfair, unusual, absurd or improbable results .... strict construction of a tariff against a carrier is not justified where such a construction ignores a permissible and reasonable construction which conforms to the intentions of the framers of the tariff, avoids possible violations of the law, and accords with the practical application given by shippers and carriers alike.

Norfolk & W. Ry. Co. v. B. I. Holser & Co., 629 F.2d 486, 488-89 (7th Cir. 1980) (internal citations omitted). Accord Milne Truck Lines, Inc., 970 F.2d 564, 567 (9th Cir. 1992) ("Because a tariff is considered to be a contract ... general principles of contract law apply .... once a court determines that a term or phrase used in a tariff is ambiguous, the court may in most instances proceed to issue a definitive interpretation of that term or phrase."); In re Carolina Motor Exp., Inc., 949 F.2d 107, 111 n.3 (4th Cir. 1991) rev'd on other grounds sub nom. Reiter v. Cooper, 507 U.S. 258 (1993) ("An unambiguous and duly published tariff is 'binding on the parties and has the force of

13

law ... regardless of the intentions of the parties or the equities existing between carrier and shipper.'"); D.S. Swain Gas Co. v. Dixie Pipeline Co., 911 F.2d 721 (4th Cir. 1990) (unpublished). Thus, unambiguous tariffs are enforced according to their plain terms, and ambiguous terms are strictly construed against the drafter using traditional principles of contract interpretation.

There is a pertinent exception to the general rule that tariffs are interpreted according to rules of contract construction. As a matter of contract construction, courts may equitably reform a contract to effectuate the intent of the parties at drafting.[3] However, as the United States Court of Appeals for the Seventh Circuit has held, courts do not have power to equitably reform a tariff upon a finding of ambiguity or mistake. W. Transp. Co. v. Wilson & Co., 682 F.2d 1227, 1231 (7th Cir. 1982). Although the Fourth Circuit has not stated the anti-reformation rule outright, the Seventh Circuit's rule follows logically from two major elements of tariff jurisprudence previously recognized by the Fourth Circuit.

First, it follows from the filed rate (or "filed tariff") doctrine, which "mandates that 'the rate of the carrier duly

---

[3] Black's Law Dictionary 471 (10th ed. 2014) accurately recites the general rule.

14

filed is the only lawful charge,'" because only the relevant administrative agency has the authority to set rates. Bryan v. BellSouth Commc'ns, Inc., 377 F.3d 424, 429 (4th Cir. 2004) (quoting AT & T v. Cent. Office Tel., Inc., 524 U.S. 214, 222 (1998)). Thus, the filed rate doctrine "bars all claims … that attempt to challenge the terms of a tariff that a federal agency has reviewed and filed." Brown v. MCI WorldCom Network Servs., Inc., 277 F.3d 1166, 1170 (9th Cir. 2002) (internal citations omitted). A court cannot reform the terms of a tariff, because that power is reserved to the FCC.

Second, the ban on reformation follows from public nature of tariffs, as opposed to the private nature of contracts. While contracts are private instruments that only govern the relationship between a closed set of parties, tariffs are public documents upon which a potentially infinite set of non-parties rely. Thus,

> the purpose of contract interpretation is to carry out the will of the parties as of the time the contract was made. An equally important purpose of tariff interpretation is to prevent special deals. That is why interpretation is permitted only when the tariff is ambiguous, so that a literal reading is impossible.

W. Transp. Co., 682 F.2d at 1231; accord Bryan 377 F.3d at 429 (noting that "prevent[ing] discrimination among consumers" is a purpose of the filed rate doctrine). Equitable reformation

15

exists to effectuate what the parties intended at the time of drafting, but the parties' intent is <u>less important</u> than the public's reliance on the language of the tariff as filed. "The doctrine's purpose is twofold: to prevent discrimination among consumers and to preserve the rate-making authority of federal agencies," <u>Bryan</u>, 377 F.3d at 429. To effectuate both these purposes, the Court adopts the Seventh Circuit's rule that courts may not engage in equitable reformation of tariffs.

## B.   **Ambiguity at Federal Common Law**

"An ambiguity exists where the language of a contract is fairly and reasonably susceptible to either of the constructions asserted by the parties." <u>Johnson</u>, 716 F.3d at 820 (interpreting a federally-governed ERISA plan); <u>Cent. Tel. Co. of Virginia</u>, 759 F. Supp. 2d at 804.

> Such ambiguity may be patent or latent .... Patent ambiguity exists when the language of the contract itself reveals that it can be interpreted in more than one way .... Latent ambiguity, although less common than patent ambiguity, arises where language '[although] appearing perfectly clear at the time the contract [is] formed, because of subsequently discovered or developed facts, may reasonably be interpreted in either of two ways.'"

<u>Lion Assocs., LLC v. Swiftships Shipbuilders, LLC</u>, 475 F. App'x 496, 501 (4th Cir. 2012) (unpublished) (internal citations to

16

Virginia law omitted); Ward v. Dixie Nat. Life Ins. Co., 257 F. App'x 620, 626-27 (4th Cir. 2007) (unpublished) (stating South Carolina law on patent and latent ambiguity); SunTrust Mortgage, Inc. v. AIG United Guar. Corp., 784 F. Supp. 2d 585, 592-95 (E.D. Va. 2011) (stating Virginia law on patent and latent ambiguity). See also Cherry v. Auburn Gear, Inc., 441 F.3d 476, 484 (7th Cir. 2006) (discussing patent and latent ambiguity in interpretation of a federally-governed ERISA contract).

## 1.   Patent Ambiguity at Federal Common Law

Federal courts do not seem to offer detailed findings when they do (or do not) find a tariff patently ambiguous, making it difficult to discern a tariff-specific rule for when tariffs are ambiguous. However, at least two courts have found that tariffs are ambiguous when they "are subject to two possible and feasible interpretations." Nat'l Van Lines, Inc. v. United States, 355 F.2d 326, 330 (7th Cir. 1966) (emphasis added); United States v. U.S. Steel Corp., 645 F.2d 1285, 1288 (8th Cir. 1981).

The Fourth Circuit also states that a tariff should not be found ambiguous when one of the plausible interpretations would lead to "unjust, absurd, or improbable results." D.S. Swain Gas Co., 911 F.2d at 721 (unpublished) (citing Nat'l Van Lines, Inc., 355 F.2d at 333). Applying Virginia state law, this Court

17

has also noted that "the mere fact that parties disagree over a contract's terms does not equate to ambiguity .... In order for contract language to be ambiguous, it must be capable of two reasonable interpretations." Cent. Tel. Co. of Virginia, 759 F. Supp. 2d at 803; see also Norfolk & W. Ry. Co., 629 F.2d at 488-89 (stating that any "ambiguity or doubt must be a reasonable one and should not be the result of a straining of the language.").

Accordingly, a tariff is ambiguous on its face when its text is subject to two possible, feasible, and reasonable interpretations, and a tariff is unambiguous when one of the alternative interpretations creates unjust, absurd, or improbable results.

### 2.   Latent Ambiguity at Federal Common Law

"Latent ambiguity arises where language '[although] appearing perfectly clear at the time the contract [] [is] formed, because of subsequently discovered or developed facts, may reasonably be interpreted in either of two ways.'" Lion Assocs., LLC, 475 F. App'x at 501 (internal citations to Virginia state law omitted); see also Suntrust Mortgage, Inc. v. United Guar. Residential Ins. Co. of N. Carolina, 508 F. App'x 243, 257 (4th Cir. 2013) (reciting Virginia state law); Cherry, 441 F.3d at 484 ("A latent ambiguity is '[a]n ambiguity that

18

does not readily appear in the language of the document, but instead arises from a collateral matter when the document's terms are applied or executed.'") (quoting Black's Law Dictionary 88 (8th ed. 2004).

> A classic example of latent ambiguity is the tale of the Peerless. A contract to buy cotton scheduled to arrive from Bombay, India, on the ship Peerless appeared plain on its face. Objective evidence revealed, however, that there were actually two ships by the same name. Thus, it became unclear which ship the goods would be on and extrinsic evidence was appropriate to aid in the resolution of the ambiguity .... If a contract lacks latent ambiguity, however, "[e]xtrinsic evidence should not be used to add terms to a contract that is plausibly complete without them."

Cherry, 441 F.3d at 484 (7th Cir. 2006) (internal citations omitted. The Fourth Circuit similarly recognizes the state common law principles permitting receipt of extrinsic evidence to resolve latent ambiguity. Suntrust Mortgage, Inc., 508 F. App'x at 257 (applying Virginia state law); SunTrust Mortgage, Inc., 784 F. Supp. 2d at 592-95 (surveying Virginia state cases on patent versus latent ambiguity, and the permissible use of extrinsic evidence only upon a finding of latent ambiguity); see also Kuhn v. Chesapeake & O. Ry. Co., 118 F.2d 400, 404 (4th Cir. 1941) (stating West Virginia state law).

### 3.   Anti-Surplusage Canons Must be Subordinated to Anti-Ambiguity Canons

Because XO's argument here turns on the role of the term "would have" in the preamble to the five-step calculation formula, the parties devoted a substantial amount of page space to discussing the merits of interpreting a contract to avoid surplusage versus the merits of interpreting a contract in context.

XO argues that the term "would have" creates a latent ambiguity that can only be resolved by extrinsic evidence about what a reasonable actor in XO's position would have done in a certain business situation. (Def.'s Partial J. Reply 14-16). Verizon replies that "[c]laimed ambiguities or doubts as to the meaning of a rate tariff must have a substantial basis in the light of the ordinary meaning of the words used and not a mere arguable basis," and that ambiguity must be determined in context rather than reading a phrase in isolation. (Pl.'s Partial J. Reply 3) (quoting United States v. Missouri-Kansas-Texas R.R. Co., 194 F.2d 77, 778-79 (5th Cir. 1952)). Thus, Verizon argues that "would have," in context, is an unambiguous term that is calculated by reference to a customer's actual purchases over the six-month period. (Pl.'s Partial J. Reply 3-5) (relying on Missouri-Kansas-Texas R.R. Co., 194 F.2d at 778-79 ("lifting [a] phrase … completely out of its context and reading it in isolation … may not be done")). In response, XO

argues that "would have" must be given effect under non-redundancy canons. (Def.'s Partial J. Reply 15) (relying on S. Ry Co. v. United States, 156 F. Supp. 740, 742 (Ct. Cl. 1957) ("It is a familiar rule in the interpretation of tariffs that all parts of the instrument should be given effect, if possible").

The Fourth Circuit affirmed both these rules of construction in a single case, indicating that canons of context and non-surplusage need not be at loggerheads in every contract interpretation.

> "ERISA plans, like contracts, are to be construed as a whole." ... Courts must look at the ERISA plan as a whole and determine the provision's meaning in the context of the entire agreement. See generally Restatement (Second) of Contracts § 202(2). And, because contracts are construed as a whole, courts should seek to give effect to every provision in an ERISA plan, avoiding any interpretation that renders a particular provision superfluous or meaningless .... see generally Restatement (Second) of Contracts § 203(a) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect....").

Johnson, 716 F.3d at 820 (some citations omitted). The best rule, then, is somewhere in between Verizon and XO's positions: all terms should be given effective meaning so that they make sense in context. See also Island Navigation Co. v. M/V VIKING

SERENADE, 35 F. App'x 524, 527 (9th Cir. 2002) (unpublished) ("Like contracts, tariffs are to be construed to give meaning to each term .... Island Navigation's proposed interpretation would render portions of the Tariff unreasonable and absurd.").

However, when "read in context" and "non-surplusage" canons do go head to head, a court should favor context and non-ambiguity over non-surplusage. In the context of statutory interpretation, the Supreme Court prefers an interpretation that follows the plain meaning and makes some words surplusage to an interpretation that creates an ambiguity but makes every phrase non-superfluous. Lamie v. U.S. Tr., 540 U.S. 526, 536 (2004) ("our preference for avoiding surplusage constructions is not absolute"). Lamie's rule for statutory interpretation applies to tariffs for two reasons. First, other circuits have applied Lamie to private contracts. TMW Enterprises, Inc. v. Fed. Ins. Co., 619 F.3d 574, 578 (6th Cir. 2010) ("'Where there are two ways to read the text' - and the one that avoids surplusage makes the text ambiguous - 'applying the rule against surplusage is, absent other indications, inappropriate.'") (quoting Lamie, 540 U.S. at 536). Second, tariffs enjoy a position somewhere between contracts and statutes, such that Lamie is even more applicable to tariffs than it is to contracts. Cincinnati, N. O. & T. P. Ry. Co. v. Chesapeake & O. Ry. Co., 441 F.2d 483, 488

22

(4th Cir. 1971) ("the tariff, so long as it is in effect, must be treated as though it has the force of law"); State of Israel v. Metro. Dade Cnty., 431 F.2d 925, 928 (5th Cir. 1970) ("A tariff required by the appropriate regulatory statute ... is more than a consensual contract. It has the force of law with the analogous dignity of a statute.").

In sum, the Fourth Circuit is not of the view that canons of context and anti-surplusage need be at loggerheads. However, when there are two ways to read a text, where the first reading avoids surplusage but makes the text ambiguous and the second reading creates surplusage but does not make the text ambiguous, the rule against surplusage is subordinated to the rule favoring non-ambiguity.

### APPLICATION OF GOVERNING LAW TO THE "CALCULATION DISPUTE"

As explained below, XO's attempt to gin up ambiguity in the shortfall provision is an unreasonable reading of a single phrase out of context. For similar reasons, that provision also does not create a latent ambiguity requiring additional evidence that would render summary judgment inappropriate.

**A.   The Shortfall Provision is not Patently Ambiguous**

    **1.   Examination of Plain Text Shows That the Tariff is not Ambiguous**

The shortfall provision is slightly unwieldy, but it is not ambiguous. It clearly states that the shortfall is calculated by a multi-step process, of which channel terminations are one of several inputs. (FCC 1 § 25.1.7(B); FCC 11 § 25.1.7(B)).

The portion of the tariff describing the shortfall provision begins with a preamble stating the goal of the formula:

> the CDP Customer shall be assessed an amount equal to the difference between (1) the total dollar amount associated with that service type or combined service type over the preceding six (6) months and (2) the total dollar amount associated with that service type or combined service type which would have been applied over the preceding six (6) months had the Minimum commitment been satisfied. <u>The Telephone Company will calculate the difference as follows</u> ...

(FCC 1 § 25.1.7(B); FCC 11 § 25.1.7(B)) (emphasis added). However, the phrase "[t]he Telephone Company will calculate the difference as follows" makes it clear that the subsequent five-step process, <u>not the preceding preamble</u>, is the method of calculating the shortfall penalty. There is no ambiguity: the first paragraph clearly states the goals of the penalty provision, and the first paragraph's final sentence just as clearly states that the five-step formula is the way to calculate the penalty.

24

After the preamble paragraph, the tariff describes a five-step formula for calculating the formula, and the five-step formula is also not ambiguous.

1. Add up the number of channel terminations the customer bought under the service over the last 6 months. Divide that number by 6.

2. Add up the amount the customer spent on <u>all elements</u> under that service over the last 6 months (not just terminations, but also any elements used at the beginning or end of the service). Divide by 6. Divide by the result of Step 1.

3. Look at how many channel terminations the CDP required for the given 6 month period. Divide by 6.

4. Subtract the result of Step 1 from the result of Step 3. (This is the difference between the number of channel terminations a customer was supposed to buy, and the number of channel terminations a customer bought.)

5. Multiply Step 2 by Step 4. (This estimates "if the customer had bought the minimum number of channel commitments, it would have also bought all these associated elements as part of the service package"). Multiply by 6.

(FCC No. 1, § 25.1.7; FCC No. 11, § 25.1.7). The formula is slightly awkward to parse, but "awkward" is not "ambiguous," and

25

does not give XO leave to ignore the phrase "[t]he Telephone Company will calculate the difference as follows."

Following the formula also does not lead to unjust, absurd, or improbable results. In practice, the formula operates to fulfill a familiar function of contract law by calculating expectancy damages. If the customer bought all the channel terminations required by the contract, then the customer would have also bought all the other elements typically (or necessarily) associated with the service as a whole, and the customer would have paid Verizon the amount stated in Step 5. The formula uses channel terminations as a bellwether for the decrease in orders for the services typically purchased in the same transaction as channel terminations. Failure to meet the minimum commitment is measured in terms of channel terminations; the amount Verizon recoups is measured by channel terminations and associated elements.

The method is not intuitive, but it makes sense as a way of approximating expectancy damages, without necessitating revision of penalties every time tariff rates change or a customer's purchasing patterns of non-termination elements change. Given that "strict construction of a tariff against a carrier is not justified where such a construction ignores a permissible and reasonable construction which conforms to the intentions of the

26

framers of the tariff ... and accords with the practical application given by shippers and carriers alike," Norfolk & W. Ry. Co., 629 F.2d at 488-89, the shortfall provision is reasonable. Nor does the provision appear, as XO claims, to "squeeze the maximum possible revenue from its competitors out of a declining line of business." (Def.'s Partial J. Reply 16). Instead, the shortfall formula provides a valuable tool to let Verizon calculate, and allows XO to know the reach of, expectancy damages in the event of a shortfall, a permissible and reasonable goal for any service provider.

### 2.   XO's Contrary Reading is Unreasonable

XO posits that the "would have" language in the preamble to the five-step formula is a reasonable reading of the shortfall provision. That is so, says XO, because using the preamble as an alternative method of calculating the shortfall results in much lower penalties for a customer than using the five-step formula.

XO hangs its hat on the notion that the preamble's "would have" language "asks what XO, as a rational business actor, 'would have' spent to meet its commitment." (Def.'s Partial J. Reply 10). XO argues that a rational actor "would have" bought (and only bought) sufficient stand-alone channel terminations to avoid imposition of the shortfall provision, because that would minimize the amount owed to Verizon. (Def.'s Partial J. Reply

27

10). Plugging this "rational activity" into the short "formula" of the preamble, XO therefore argues that it is plausible for the shortfall to be calculated as "the difference between (1) what XO spent over the last six months and (2) the cost of also buying enough channel terminations to meet the minimum commitment, because buying only channel terminations is what a business actor would have done."

XO's reading ignores context in two ways. First, it ignores that the first paragraph of § 25.1.7 clearly functions merely as a preamble stating the goals of the subsequent five-step test, and it ignores the text that "[t]he Telephone Company will calculate the difference as follows" appears <u>after</u> the preamble. The plain meaning of this language clearly tells a customer that the five-step formula <u>after</u> the preamble, and not the preamble itself, is the way to calculate the shortfall. XO's reading of the preamble as an alternative calculation tool is irrational, absurd, and improbable, and does not rise to the level of creating ambiguity.

Second, XO's reading ignores the function that "would have" serves <u>in the context</u> of the preamble, as illustrated by Step 2. "Would have" does not ask a hypothetical. It is retrospective, and looks at the customer's <u>actual behavior</u> over the last six months, specifically as to related elements that the customer

28

bought in that period when it bought channel terminations. This is apparent when read in conjunction with Step 2 of the five-step process, which states that Verizon will "sum[] the total monthly charges associated with all channel terminations, channel mileage, multiplexing arrangements, and IEF terminations or IEF interface rate elements for that service type … over the preceding six (6) months." (FCC No. 1, § 25.1.7; FCC No. 11, § 25.1.7). In this context, "would have" does not call for speculation about what a rational business actor hypothetically would have done. Instead, it plugs in two non-hypothetical pieces of information (the number of channel terminations required by the minimum commitment and the services actually purchased by a customer over the past six months) to calculate the shortfall penalty. Because the preamble does not ask what a hypothetical actor would have done, the shortfall cannot be calculated according to the preamble as "the difference between (1) what XO spent over the last six months and (2) the cost of only channel terminations, because buying only channel terminations is what a business actor would have done."

Because the tariff is not susceptible to two possible, feasible, and reasonable interpretations, it is not ambiguous. Because the tariff is not ambiguous, it need not be construed strictly against Verizon, and the plain meaning of the text

controls. The plain meaning of "[t]he Telephone Company will calculate the difference as follows" is that the subsequent test is the one and only test used to calculate the shortfall penalty.

### 3. The Plain Meaning Reading Does Not Create Surplusage, and, Even if it Did, Surplusage is Not the Controlling Canon of Interpretation

Reading the tariff as Verizon argues does not actually create surplusage. Reading the term "would have" in context makes it clear that "would have" is shorthand in the brief preamble, which describes what Verizon is trying to calculate (expectancy) before laying out the longer-form formula for how that expectancy is calculated. As in Johnson, 716 F.3d at 813, canons of context and anti-surplusage are not actually at odds. The introductory paragraph is quite clearly just an introductory paragraph, and is clear that the actual computation is decided according to the five-step formula ("The Telephone Company will calculate the difference as follows..."). (FCC 1 § 25.1.7(B); FCC 11 § 25.1.7(B)). However, even if the plain text reading rendered "would have" mere surplusasge, that result would be preferable to creating ambiguity under Lamie, 540 U.S. at 536, and TMW Enterprises, Inc., 619 F.3d at 578.

Given the text that "[t]he Telephone Company will calculate the difference as follows" at the end of the first paragraph of

§ 25.1.7(B), there is only one possible, feasible, and reasonable way to read the tariff: the first paragraph is an illustrative preamble, and the five-step test is the actual formula. XO's attempt to pull an alternate formula out of the introductory paragraph requires an unreasonable reading of the structure of § 25.1.7(B) and of the role that "would have" plays in the context of the preamble, particularly in conjunction with Step 2.

Because there is only one possible, feasible, and reasonable way to read § 25.1.7(B), the tariff is not ambiguous. The Court must follow the text of the tariff.

**B.  "Would Have" Does not Create a Latent Ambiguity**

XO claims that, even if the Court does not accept that XO "would have" bought only channel terminations because that is clearly what a cost-averse rational business actor would do, "would have" nonetheless creates a latent ambiguity that requires the introduction of evidence on the issue of what XO's purchasing patterns show XO actually would do. (Def.'s Partial J. Reply 14).

Again, this is irrelevant because the tariff's use of "would have" does not refer to hypotheticals. XO is not entitled present evidence on what it would have done in a hypothetical world, because the tariff clearly does not call hypothetical

worlds into play. Its only inputs are the minimum commitment and what XO actually ordered over the previous six months. That data was included along with Verizon's Motion for Partial Summary Judgment. (Pl.'s Partial J. Mtn., Exs. 1-12).

Because there is no ambiguity, XO is not entitled to introduce extrinsic evidence and prevent partial summary judgment. Suntrust Mortgage, Inc., 508 F. App'x at 257; Cherry, 441 F.3d at 484.

For the foregoing reasons, the Court finds in favor of Verizon on the Calculation Dispute and on that issue will grant partial summary judgment in favor of Verizon.

## APPLICATION OF GOVERNING LAW TO THE "3 MONTH DISPUTE"

The interaction of the Custom Solutions Agreement ("CSA") and the shortfall provision would not be ambiguous if XO's CSA created a six-month terminal period. However, because XO's CSA did create a three-month terminal period, it is impossible to apply the shortfall provision — as written in six month terms — to the three-month terminal period. The CSA and the five-step formula of the shortfall agreement together create a latent ambiguity. However, as noted above, the characterization of this dispute as a tariff or contract dispute alters the interpretive tools and the remedies available to this Court.

**A.    Text   of   the   Two   Governing   Documents   Creates   Latent Ambiguity**

This dispute is governed by the CDP section of the tariffs and by a single paragraph that appears in the CSA and in Verizon's tariffs.

The tariff states that, "[i]f the CDP Customer fails to maintain its minimum commitment for a service type … over the preceding six (6) months, the CDP customer shall be assessed" a shortfall calculated based on the customer's purchases over the previous six months. (FCC 1 § 25.1.7(B); FCC 1 § 25.1.7(B)). The tariff repeatedly casts everything in terms of six-month intervals: the minimum commitment is calculated based on six-month intervals and the shortfall provision is calculated based on six-month intervals. (FCC No. 1. § 25.1.7; FCC No. 11 § 25.1.7). The five-step formula divides and multiplies amounts by six. It is impossible to follow the five-step formula as written using three-month data.

On the other hand, the CSA states that:

> [i]f the Customer is signed up for Verizon's Commitment Discount Plan ... as of the Effective Date, the Commitment Discount Plan shall be subject to the following provisions...: (i) Subject to any early termination of the Agreement or the Customer's subscription to the Contract Tariffs, the Commitment Discount Plan is deemed extended as necessary to be coterminous with the end of Plan Year 5 .... All other terms and conditions applicable to

33

> the Commitment Discount Plan (including discounts and the minimum period and review/true-up requirements) remain unchanged by this Section 12....Upon expiration of Plan Year 5, the Commitment Discount Plan will be subject to the existing regulations that apply upon expiration of the Commitment Discount Plan, including establishment of new commitments.

(Docket No. 41, Ex. 4, Ex. B § 12). Identical language discussing the interaction of CDPs and tariffs appears in the tariffs. (FCC 1 § 21.60(L); FCC 11, § 32.58(L)). The "true-up" requirements referenced in the CSA at § 21.60(L) and §32.58(L) are the shortfall provisions of FCC 1 § 25.1.7(B) and FCC 11 § 25.1.7(B). (Tr. Sep. 29, 2015 Hr'g 54:21-25, 77:6-24). Reading the plain text of both documents, the CSA clearly contemplates the creation of a non-six-month terminal period at the conclusion of the five-year duration of the CSA.

However, it is plainly impossible to apply the shortfall provision, as drafted, to any period that is not six months in duration. When the terminal period is not six months long, as is the case with XO's CSA, the CSA and the five-step formula become impossible to reconcile, creating a latent ambiguity.

**B.   The 3-Month Dispute is a Tariff Dispute, and Strict Construction Against Verizon Necessitates Judgment for XO**

As noted previously, tariffs and contracts are largely interpreted using identical rules. However, two exceptions to this general rule are applicable here. First, ambiguous tariffs

34

are strictly construed against their drafters, Norfolk & W. Ry. Co., 629 F.2d at 488-89, while contracts are merely construed against their drafters. Cent. Tel. Co. of Virginia, 759 F. Supp. 2d at 804.[4] Second, courts may not engage in equitable reformation of a tariff. E.g., W. Transp. Co. v. Wilson & Co., 682 F.2d at 1231. In this case, if this were a contract dispute and the parties intended that the shortfall provision apply to the terminal three-month period, then the Court could "reform" the five-step formula to divide by three rather than six. If this is a tariff dispute, then the Court does not have the power to reform the contract, and "any ambiguity or doubt should be decided in favor of the [non-drafter]." Norfolk & W. Ry. Co., 629 F.2d at 488-89.

Accordingly, it is necessary to determine whether the "3-Month Dispute" is a tariff dispute or a contract dispute. XO describes the dispute as arising out of the CDP portion (§ 25.1)

---

[4] A certain subset of contracts are "strictly construed" against the drafter in the same way that ambiguous tariffs are, including security agreements, some types of insurance agreements, and (under Virginia law) restraint on trade agreements. E.g., Cornerstone Title & Escrow, Inc. v. Evanston Ins. Co., 555 F. App'x 230, 235 (4th Cir. 2014) (unpublished). Aside from these special cases, however, the general rule of contra proferentem requires that ambiguity be merely "construed against" the contract drafter, rather than "strictly construed against" the contract drafter. Cent. Tel. Co. of Virginia, 759 F. Supp. 2d at 804.

of the relevant tariffs. (Def.'s Partial J. Reply 8-9). Verizon, however, describes the CSA as a "contract tariff." (Pl.'s Partial J. Reply 7 n.5).

On this record, the "contract tariffs" must be treated as tariffs for the purpose of determining applicable rules of construction and relief. The relevant language of the CSA appears word-for-word in the tariffs. (FCC 1 § 21.60(L); FCC 11 § 32.58(L)). Verizon acknowledged at the hearing that contract tariffs, including the contract tariff at issue, are filed with the FCC. (Tr. Sep. 29, 2015 Hr'g 56:3-6). Additionally, filing is required by federal regulation. 47 C.F.R. § 61.22 (noting that contract tariffs must be filed with the FCC). A filed tariff is subject to the filed rate doctrine. The filed rate doctrine prohibits courts from changing tariffs. Brown, 277 F.3d at 1170 ("In addition to barring suits challenging filed rates and suits seeking to enforce rates that differ from the filed rates, the filed-rate doctrine also bars suits challenging services, billing, or other practices when such challenges, if successful, would have the effect of changing the filed tariff.") (relying on Am. Tel. & Tel. Co., 524 U.S. at 223). The act of filing, at which point the public might rely upon the tariff, undergirds the rule against not allowing courts to modify tariffs.

36

> [T]he purpose of contract interpretation is to carry out the will of the parties as of the time the contract was made[,] [a]n equally important purpose of tariff interpretation is to prevent special deals. That is why interpretation is permitted only when the tariff is ambiguous, so that a literal reading is impossible.

W. Transp. Co., 682 F.2d at 1231. Because the act of filing and agency approval trigger the filed rate doctrine, and because "contract tariffs" are filed, they must be subjected to the same restraints on interpretation and relief applicable to standard tariffs.

The Court finds that the 3-Month Dispute is a tariff dispute and that the plain meaning of the CSA cannot be read as creating a special scaled shortfall provision into the CSA for the terminal three-month period. Because this is a tariff dispute, the Court cannot reform the CSA or the CDP to scale down the five-step shortfall provision: it can only interpret and enforce the plain meaning of the tariff. Furthermore, the Court must strictly construe the tariff against its drafter. Hence, the Court will not read a three-month shortfall provision into the tariff where no such provision exists.

On this basis, the Court finds in favor of XO on the 3-Month Dispute and on that issue will grant partial summary judgment in favor of XO.

C.    **In the Alternative, Contract Principles also Necessitate Judgment In Favor of XO**

Even if the 3-Month Dispute were a contract dispute (which it is not), then intent of the parties and construction against a drafter would still necessitate that the 3-Month Dispute be resolved in favor of XO.

Though intent of the parties is irrelevant when examining an unambiguous tariff, it is relevant when examining contracts and ambiguous tariffs. E.g., Schneider v. Cont'l Cas. Co., 989 F.2d 728, 731 (4th Cir. 1993) (recognizing that, under Virginia law, intent of the parties is relevant in the face of ambiguity); D.S. Swain Gas Co. v. Dixie Pipeline Co., 911 F.2d 721 (4th Cir. 1990) (noting that intent of the parties is relevant when interpreting ambiguous tariffs); W. Transp. Co., 682 F.2d at 1231 (recognizing party intent as a general precept of contract interpretation); SunTrust Mortgage, Inc., 784 F. Supp. 2d at 593 (noting that, under Virginia law, latent ambiguity may be resolved by resort to evidence of the parties' intent). In the case of contracts, ambiguity is construed against the drafter under the rule of contra proferentem. SunTrust Mortgage, Inc., 784 F. Supp. 2d at 598, 594 n. 14; Cent. Tel. Co. of Virginia, 759 F. Supp. 2d at 804.

As XO points out, neither the tariff nor the CSA contains language authorizing prorated shortfall penalties, and other

portions of the tariff "show that Verizon knows full well how to write language that imposes penalties scaled to time periods of different lengths." (Def.'s Partial J. Reply 9); see also, e.g., FCC No. 1. § 25.1.9(c)(1)(b) (creating a scaled penalty provision). If Verizon did not include a scaling provision, XO reasons, it is because XO did not intend to include a scaling provision.

Verizon's response is an appeal to common business sense. In Verizon's view, the CSA

> cannot reasonably be read as an agreement by Verizon to give XO the CDP discounts for that final, three-month period irrespective of whether XO satisfied its commitments. Instead, the only reasonable reading is that, just as XO was entitled to (and did) receive the CDP discounts over those three months, it remained subject to the shortfall payment obligation if it missed its commitments.

(Pl.'s Partial J. Reply 7). Verizon's position is superficially appealing. It postulates, in brief, that a rational business actor does not give away something for nothing. Thus, it is improbable that Verizon intended to offer a discount without expecting an enforcement mechanism to apply. Accordingly, says Verizon, the parties must have intended to impose a scaled shortfall formula. The result then is that the documents as written are the product of mutual mistake and should be

39

interpreted to best reflect the will of the parties at the time of drafting. (Pl.'s Partial J. Reply 7).

However, Verizon's position is less appealing when taken in context. The CSA is several hundred pages long, and although the $4.9 million CDP dispute is the largest dispute in this litigation (Stipulation ¶ 4; Tr. Aug. 26. Hr'g, Docket No. 64, 66:1-4), it does not dominate the business done between XO and Verizon. (Answer ¶ 45) ("XO's charges from Verizon … average roughly … $132,000,000 per year"). In context, Verizon was not only receiving a minimum commitment and a shortfall penalty: it was receiving XO's commitment to the entire CSA, of which the CDP was only a portion. See, e.g., FCC No. 1 § 21.2(E) (describing a customer's obligation under a contract tariff to meet minimum revenue requirements in exchange for incentives).

Additionally, Verizon's intent argument is severely undermined by the fact that the plain text of XO's CSA and of § 25.1.7(B) clearly do not contemplate a scaled shortfall provision, and that the five-step formula as written cannot be applied to any period but a six-month period. Verizon's tariffs do contain scaled penalty provisions found elsewhere (e.g. FCC No. 1 § 25.1.9(C)(1)(b)), indicating that adding such a provision would have been feasible at the time of drafting.

Given that none of the relevant documents contemplates a scaled shortfall provision, and that the record contains no evidence to the contrary, the Court finds that the parties did not intend to create a scaled shortfall provision. Therefore, even if the 3-Month Dispute were a contract dispute, the intent of the parties and the rule of contra proferentem would necessitate finding in favor of XO on the 3-Month Dispute. For the foregoing reasons, the Court would grant partial summary judgment on this issue in favor of XO even if the 3-Month Dispute is assessed as a contract issue.

## CONCLUSION

For the reasons set forth above, Plaintiff's MOTION FOR PARTIAL SUMMARY JUDGMENT (Docket No. 40) is GRANTED in part and DENIED in part. The Court finds in favor of Verizon on the "Calculation Dispute." The Court finds in favor of XO on the "3-Month Dispute." Applying the Stipulation, the Court will enter judgment for Verizon in the amount of $2,711,989.

It is so ORDERED.

/s/    REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: November 4, 2015

41