

NOV - 6 2015

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

VERIZON VIRGINIA, LLC,
et al.,

    Plaintiffs,

v.                         Civil Action No. 3:15-cv-171

XO COMMUNICATIONS, LLC
et al.,

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on Defendants' RENEWED MOTION TO COMPEL ARBITRATION (Docket No. 57) ("Def.'s 2d Arbitration Mtn."). For the reasons stated below, the motion will be granted as it relates to the Texas and Florida claims and denied as it relates to California claims that were also the subject matter of the 2007 Settlement Agreement between the parties.

## BACKGROUND

### A. Procedural Posture

Plaintiffs are fourteen state or regional Verizon corporate entities (collectively, "Verizon"). Defendants are XO

Communications, LLC and XO Virginia, LLC (collectively, "XO").
Verizon is an "incumbent local-exchange carrier" ("ILEC"), one
of the phone companies that enjoyed a local monopoly before
enactment of the 1996 Telecommunications Act. E.g., Cent. Tel.
Co. of Virginia v. Sprint Commc'ns Co. of Virginia, 715 F.3d
501, 506 (4th Cir. 2013) cert. denied, 134 S. Ct. 423 (2013);
Verizon Md., Inc. v. Global NAPS, Inc., 377 F.3d 355, 359 (4th
Cir. 2004). Under the Telecommunications Act, ILECs such as
Verizon must provide competitors with access to the ILECs
extensive infrastructure at set rates through interstate
tariffs, intrastate tariffs, and/or federally governed private
contracts called "interconnection agreements" ("ICAs"). 47
U.S.C. § 251; CGM, LLC v. BellSouth Telecomm., Inc., 664 F.3d
46, 50 (4th Cir. 2011); Verizon Md., Inc., 377 F.3d at 358. XO
is a "competitive local exchange carrier" ("CLEC"), one of the
competitors allowed to access an ILEC's infrastructure under the
Telecommunications Act. E.g., Cent. Tel. Co., 715 F.3d at 506.

Verizon's Complaint, in sum, alleges that XO failed to pay
fees that it owed to Verizon under federal tariff schedules,
intrastate tariff schedules, and the parties' ICAs. (Docket No.
1) (Compl. ¶¶ 1, 50). The Complaint additionally alleges that XO
failed to pay late fees on those non-payments. (Compl. ¶ 4).

On May 13, 2015, XO filed three motions: a Motion to Dismiss Pursuant to FRCP 12(b)(6) (Docket No. 20), a Motion to Refer Claims for Agency Resolution (Docket No. 22), and a Motion to Compel Arbitration on all claims arising out of transactions in California, Texas, and Florida. (Docket No. 21) ("Def.'s Mtn. to Compel"). In support of these motions, XO filed its Consolidated Memorandum in Support (Docket No. 23) ("Def.'s Consolidated Mem."). On June 9, 2015, Verizon filed a Memorandum of Law in Opposition to XO's Motions to Dismiss, to Compel Arbitration, and for a Primary Jurisdiction Referral (Docket No. 33) ("Pl.'s Mem. in Opp'n"). On August 25, 2015, the Court denied the Motion to Dismiss (Docket No. 20) and the Motion to Refer (Docket No. 22). (See Order, Docket No. 46). On August 26, 2015 following oral argument, the Court continued the Motion to Compel Arbitration pending further briefing. (Order, Docket No. 49).

XO filed its Renewed Motion to Compel Arbitration and its corresponding Memorandum in Support (Docket No. 58) ("Def.'s 2d Arbitration Mem.") on September 4, 2015. The motion has been fully briefed and argued and is ripe for decision.

**B.   Claims at Issue**

The ICAs for California, Texas, and Florida each contain an arbitration clause. In its original motion, XO accordingly

3

requested that the Court order that all claims arising in California, Texas, and Florida be submitted to private binding arbitration, or, in the alternative that the Court stay this action pending arbitration. (Def.'s Mtn. to Compel 2). Since then, XO has identified the claims in ¶¶ 96-98 and ¶¶ 102-104 of the Complaint as being subject to the arbitration provisions, though it also alleges generally that any other disputes arising out of those states should be referred to arbitration. (Def.'s Consolidated Mem. 17).

The parties do not dispute that the arbitration clauses in the California, Texas, and Florida ICAs exist, or that the Federal Arbitration Act (FAA) favors arbitration agreements. The parties also agree that, under the FAA, courts must refer disputes to arbitration where: (1) a valid agreement to arbitrate exists; and (2) the dispute falls within the scope of the agreement to arbitrate. Both sides point to the decision in GE Capital Corp. v. Union Corp. Fin. Grp. Inc., 142 F. App'x 150, 152 (4th Cir. 2005) (unpublished), as supplying the appropriate standard. (Def.'s Consolidated Mem. 15; Pl.'s Mem. in Opp'n 10).

The parties dispute the second element of GE Capital: whether Verizon's claims fall within the scope of the agreement to arbitrate. The parties also dispute what test applies to

determine whether a dispute falls within the scope of an agreement to arbitrate.

As to the applicable test for the scope of the agreement, XO argues that, under Fourth Circuit precedent, a claim that does not arise directly from a contract containing a broad arbitration claim must nonetheless be referred to arbitration when the claim is "significantly related" to the contract. Verizon argues that orders from a tariff are subject to an ICA's arbitration clause only when the ICA incorporates the tariff by reference.[1]

The parties also raised a secondary issue in the latest round of briefing: the effect of the parties' 2007 Settlement Agreement (Docket No. 76) on the California ICA and on California orders placed by XO. (Def.'s 2d Arbitration Mem. 13-16; Pl.'s Mem. in Opp'n to Compel Arbitration, Docket No. 71, 11-13, "Pl.'s 2d Arbitration Mem. in Opp'n"; Def.'s Reply in

---

[1] Both parties have changed their positions since the original round of briefing. In the first round, Verizon asserted that all of its claims arose solely out of tariffs, and that, even though the ICAs exist, XO was always ordering services from the tariff list. (Pl.'s Mem. in Opp'n 10) ("XO does not explain how any provision … of those interconnection agreements transforms XO's orders from Verizon's state tariffs into orders from the interconnection agreements."). XO asserted that, once parties entered into an ICA, the ICA superseded the tariff and all interaction between the parties is "through" the ICA. (Def.'s Consolidated Mem. 5-6, 17). Those positions have been abandoned in the subsequent round of briefing and will not be further considered.

Resp. to 2d Mtn. to Compel Arbitration, Docket No. 73, 14-16, "Def.'s 2d Arbitration Reply"). In particular, the 2007 Settlement Agreement provides that, if the parties cannot resolve any disputes "regarding the interpretation or enforcement" of the Agreement by good faith negotiation, then "either Party may pursue any remedies available to it under this Agreement, at law, in equity, or otherwise, including, but not limited to, instituting an appropriate proceeding before ... a court of competent jurisdiction." (2007 Settlement Agreement 9). The 2007 Settlement Agreement also contains an integration clause providing that, as to matters within its scope, it supersedes all other agreements between the parties. (2007 Settlement Agreement 11). Interpretation of the 2007 Settlement Agreement, then, is key to the arbitrability of the transport trunk disputes at ¶¶ 102-104 of the Complaint, and the less specific claims in ¶¶ 96-98 of the Complaint.

## DO THE INTERCONNECTION AGREEMENTS COMPEL ARBITRATION?

### A.    Procedural Approach

The FAA states a strong preference for enforcing arbitration. Under the FAA, courts must refer disputes to arbitration where: (1) a valid agreement to arbitrate exists; and (2) the dispute falls within the scope of the agreement to

6

arbitrate. Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc., -- F.3d --, 2015 WL 4637967, at *6 (4th Cir. Aug. 5, 2015). On those points, the parties agree. (Def.'s Consolidated Mem. 15; Pl.'s Mem. in Opp'n 10) (relying on GE Capital Corp, 142 F. App'x at 152).

However, the parties dispute the governing legal standard for determining whether the claims in ¶¶ 96-98 and ¶¶ 102-104 of the Complaint fall within the scope of their ICA agreements to arbitrate. The parties' briefs and their oral advocacy were two ships passing in the night: XO relies on binding, but quite general, Fourth Circuit precedent, J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 321 (4th Cir. 1988), and Verizon relies on ICA/tariff-specific precedent, Broadview Networks, Inc. v. Verizon Tel. Co., 19 F.C.C. Rcd. 22216, 22221 (2004). For the reasons stated below, the Court concludes that the Broadview approach is to be used as a measure to determine whether there a "significant relationship" between a claim and a contract with an arbitration clause under the J.J. Ryan test.

**1. Framework for Assessing Arbitrability of Claims which are Not Directly Covered by an Arbitration Clause**

   **(a) XO's Proposed Standard: J.J. Ryan and "Any Significant Relationship"**

XO correctly states the governing law for cases where a claim does not directly arise out of a contract that contains an

arbitration clause: J.J. Ryan requires first that a court look to see if the arbitration clause is broad; and second, if the clause is broad, that a court look to see if the claim is "significantly related" to the contract with the arbitration clause. J.J. Ryan, 863 F.2d at 321.

First, XO argues that the three ICAs in question all contain "broad" arbitration language. (Def.'s 2d Arbitration Mem. 5–6). The California ICA uses "arising under or related to," (Docket No. 23, Ex. 11 § 14), and the Florida and Texas ICAs use "arising out of or relating to." (Docket No. 23, Ex. 14 § 14; Docket No. 23, Ex. 21 § 14). XO is correct that "arising under or [relating/related] to" is broad arbitration language, e.g., People's Sec. Life Ins. Co. v. Monumental Life Ins. Co., 867 F.2d 809, 815 (4th Cir. 1989), and Verizon does not dispute this proposition.

Second, XO also correctly states the standard for determining the arbitrability of disputes that do not directly arise out of the contract with the arbitration clause when the arbitration clause has broad arbitration language: "every dispute between the parties having a significant relationship to the contract regardless of the label attached to the dispute" is subject to arbitration. (Def.'s 2d Arbitration Mem. 6) (quoting J.J. Ryan, 863 F.2d at 321). In applying this standard, however,

XO's briefs proceed as though the inquiry is over once a court finds a clause of broad application. That is evident because XO repeatedly misstates the test as merely "related," when the J.J. Ryan inquiry is "significantly related." (Def.'s 2d Arbitration Mem. 10-13; Def.'s 2d Arbitration Reply 7-9, 12-13). Because of that misapprehension, XO's briefing does not confront how to determine whether its tariff orders (and the resulting disputes) are "significantly related" to the ICAs.[2]

However, cases in the J.J. Ryan line do provide guidance on how to assess the "significant relationship" question. For example, the Fourth Circuit has held that "a court must review the factual allegations underlying the particular claim and evaluate the connection between those allegations and the contract containing the arbitration clause." Great Am. Ins. Co. v. Hinkle Contracting Corp., 497 F. App'x 348, 354 (4th Cir. 2012) (unpublished) (emphasis added).[3] Courts that have reached the "evaluate for significant relationships" stage often conclude that the arbitration clause applies. E.g., Great Am. Ins. Co., 497 F. App'x at 354; Am. Recovery Corp. v.

---

[2] At oral argument, XO's counsel stated that he had not identified any cases explaining how to measure "significantly related." (Tr. Sept. 29 2015 Hr'g 4:12-17).

[3] In our circuit, unpublished opinions are not binding. However, they nonetheless are useful analytical tools.

Computerized Thermal Imaging, Inc., 96 F.3d 88 (4th Cir. 1996);

J.J. Ryan & Sons, Inc., 863 F.2d at 321. However, it is not

always the case that a dispute arising out of one instrument

without an arbitration clause is "significantly related" to a

second contract with an arbitration clause. E.g., Wachovia Bank,

Nat'l Ass'n v. Schmidt, 445 F.3d 726, 764 (4th Cir. 2006).

     In Wachovia, plaintiff and defendant had "two distinct

relationships": defendant advised plaintiffs to invest in a

financial deal that ultimately went sour, and defendant had

loaned money to plaintiffs so that plaintiffs could invest in

that financial deal. Id. at 768. Plaintiffs filed state law

claims based on the financial deal. Id. at 766. While the

lending contract had a broad arbitration clause, the investment

deal document had no arbitration clause. Id. at 767. The Fourth

Circuit then considered several facts in evaluating the

connection between the allegations of the complaint and the

contract containing the arbitration clause: (1) the fact that

the claims derived from defendants' adviser-advisee relationship

while the arbitration clause dealt with the defendants' lender-

lendee relationship; (2) the fact that court resolution of the

claims would "require no inquiry into the [lending

relationships]'s terms, nor even knowledge of the [promissory

note's] existence"; and (3) the fact that the financial deal and

the lending transaction were not part of a "single, integrated course of dealing" because plaintiffs could have participated in the financial deal without taking out a loan from Wachovia. Id. at 768. The Wachovia court also pointed out that the investment-advising relationship started before the lending relationship, whereas in J.J. Ryan the contract with the arbitration clause was the same contract that created the relationship, and that contained provisions necessary to carry forth the relationship.

> Although in both Long and J.J. Ryan, we interpreted arbitration clauses materially identical to the one in the Note to encompass claims that did not arise directly from the agreement containing the clauses, each of those decisions involved claims that derived from the specific relationship created by the relevant agreement. See [Long v. Silver, 348 F.3d 309, 317-19 (4th Cir. 2001)] (concluding that arbitration clause in shareholder and employment agreement encompassed tort and contract claims that arose from shareholder and employment relationships created by agreement); J.J. Ryan, 863 F.2d at 318-19 (ruling that arbitration clause in exclusive distribution contract encompassed claims involving enforcement of ancillary agreements that were necessary to implement distribution contract) ....

Wachovia Bank, Nat'l Ass'n, 445 F.3d at 769. The analysis in Wachovia was not presented as an official checklist, test, or exclusive list of factors for applying the "significant relationship" facet of the test. However, Wachovia signals that those facts are important in determining whether a "significant

relationship" exists between XO's tariff orders and the XO-Verizon ICA.

### (b) Verizon's Standard: <u>Broadview</u>

In <u>Broadview Networks</u>, a New York trial court ordered the parties to arbitration. That court faced a similar question to the one that this Court faces now: "whether, in the context of the telecommunications industry, a party may compel arbitration of a dispute concerning obligations governed by the terms of a filed tariff, on the basis of an arbitration agreement which is not contained in that tariff." <u>Verizon N.Y. Inc. v. Broadview Networks, Inc.</u>, 5 Misc. 3d 346, 348, 781 N.Y.S.2d 211, 213 (N.Y. Sup. Ct. 2004). Broadview contended that the parties' dispute arose out of the tariffs rather than the ICA. In a thoughtful opinion, the New York court found that, "[w]hen an interconnection agreement contains a provision providing for a CLEC's purchase of services at the rates and on the terms set forth in a tariff filed by the ILEC, and the CLEC makes such a purchase, the CLEC 'is acting <u>through</u> [the] interconnection agreement.'" <u>Verizon N.Y. Inc.</u>, 5 Misc. 3d at 350-51 (quoting <u>U.S. W Commc'n, Inc. v. Sprint Commc'n Co., L.P.</u>, 275 F.3d 1241, 1251 (10th Cir. 2002) (emphasis in original)). Because Broadview ordered through the ICA, which had an arbitration clause, its claims were arbitrable.

12

The decision of a New York court is, by itself, not binding here. However, in disposing of Broadview's related complaint before the FCC, the FCC subsequently concluded that:

> the New York Order's conclusion that the Interconnection Agreement (including its mandatory arbitration provision), rather than Verizon's tariffs standing alone, governs this dispute is reasonable, <u>given that (i) the Interconnection Agreement clearly incorporates the tariffs with respect to the collocation orders at issue</u> here, and (ii) at least one federal court of appeals has held that, when an interconnection agreement incorporates a tariff, the parties thereafter act through the agreement, not the tariff. Moreover, the New York Order's conclusion that the Interconnection Agreement's mandatory arbitration provision encompasses this dispute is reasonable, <u>in light of (i) the breadth of the provision's language</u>, and (ii) the federal policies favoring arbitration and resolving any doubt in favor of arbitrability.

<u>Broadview Networks, Inc.</u>, 19 F.C.C. Rcd. at 22221 (emphasis added).[4] That decision gave the FCC's imprimatur to the New York decision.

_____

[4] The FCC relied on the same Tenth Circuit case as had the New York court:

> under the terms of the interconnection agreement, Sprint can purchase services at specific rates and terms listed in its interconnection agreement, or, alternatively, can purchase services at the rates and terms set forth in Qwest's

The FCC's decision is not binding here either. However, the FCC's finding that telecommunications ICAs may incorporate tariffs under certain circumstances, and that incorporation is relevant to arbitrability of tariff orders, is entitled to deference. Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837 (1984). Additionally, this Court has approvingly cited the same Tenth Circuit passage undergirding the decisions of the New York court and the FCC in Broadview. Cent. Tel. Co. of Virginia v. Sprint Commc'ns Co. of Virginia, 759 F. Supp. 2d 789, 799 n.6 (E.D. Va. 2011), aff'd, 715 F.3d 501 (4th Cir. 2013). The Court accordingly recognizes that incorporation is relevant to an arbitrability inquiry when dealing with tariffed services.

Verizon framed its latest brief around the Broadview rule that an ICA (and the ICA's arbitration language) governs in place of a valid tariff when (1) the ICA clearly incorporates the tariffs with respect to the orders/charges at issue and (2) the arbitration language in the ICA is broad. (Pl.'s 2d Arbitration Mem. in Opp'n 6-10).

In its Reply, XO attempted to distinguish Broadview by highlighting that the arbitration clause in Broadview was

---

tariffs.  Either  way,  Sprint  is  acting through its interconnection agreement.

U.S. W. Commc'ns, Inc., 275 F.3d at 1250-51.

narrower than the ICAs before the Court in this case. Therefore, XO asserts, <u>Broadview</u> cannot establish a general rule limiting arbitrability to cases where the tariff is incorporated into the ICA. (Def.'s 2d Arbitration Reply 9 n.6). However, the fact that the contract language in <u>Broadview</u> was different does not negate the utility of <u>Broadview</u> as a tool for analyzing the existence of a significant relationship. Indeed, the <u>Broadview</u> approach or test even takes the breadth of the arbitration clause's language into account. <u>Broadview Networks</u>, 19 F.C.C. Rcd. at 22221 ("the <u>New York Order</u>'s conclusion that the Interconnection Agreement's mandatory arbitration provision encompasses this dispute is reasonable, <u>in light of (i) the breadth of the provision's language</u>, and (ii) the federal policies favoring arbitration and resolving any doubt in favor of arbitrability.") (emphasis added). The factual differences between <u>Broadview</u> and this case do not make <u>Broadview</u> inapplicable here, especially because the FCC's <u>Broadview</u> inquiry already takes into account the scope of the arbitration clause language.

### (c)   Integrating <u>J.J. Ryan</u> and <u>Broadview</u>

<u>J.J. Ryan</u> and its progeny are binding on this Court; <u>Broadview</u> must be given deference. Fortunately, the two-part <u>J.J. Ryan</u> test is not incompatible with <u>Broadview</u>.

15

S. New England Tel. Co. v. Global NAPS, Inc., No. 3:04-CV-2075 (JCH), 2006 WL 1169805 (D. Conn. Apr. 28, 2006) shows how to integrate a test similar to that in J.J. Ryan with the Broadview approach. The facts of Global NAPS are similar to those in this case: defendant moved to compel arbitration based on the mandatory arbitration provision of the parties' ICA; plaintiff argued that defendant ordered circuits pursuant to the tariff and independently of the parties' obligations under the ICA, such that the dispute was not within the scope of the arbitration provision. Id. at *1-2. To resolve the dispute, the court applied the Second Circuit's equivalent of the J.J. Ryan test. Id. at *4.[5]   First, the court examined the scope of the arbitration clause (finding that it was not broad). Id. Second, the court found that the plaintiff's claims (based on defendant's tariff purchases) were not "on their face" disputes

---

[5] The Second Circuit test requires a court to:

> [f]irst … classify the particular clause as either broad or narrow. Next, if reviewing a narrow clause, the court must determine whether the dispute is over an issue that "is on its face within the purview of the clause," or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause .... Where the arbitration clause is broad, "there arises a presumption of arbitrability."

Id. at *4 (quoting Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc., 252 F.3d 218, 225 (2d Cir. 2001).

"arising out of or related to the ICA, but, rather, even on Global NAPS's version of the facts, involve[d] collateral agreements that [were] outside the purview of the narrow arbitration clause." Id. at *8. In so doing, the court distinguished Broadview, saying that "[u]nlike [Broadview], Global NAPS has not demonstrated that the ICA here contains a provision that references SNET's federal tariffs and provides that Global NAPS will purchase services at the rates established in the tariff ... The federal tariff is not incorporated into the ICA as it is in [Broadview]." Id. at *8 n.3.

The best reading of Broadview, then, is that tariff "incorporation" is a relevant factor in determining, as required by the second part of J.J. Ryan, whether "the factual allegations underlying the particular claim" have a "significant relationship" to the contract containing the arbitration clause. Great Am. Ins. Co., 497 F. App'x at 354. Global NAPS is a sensible approach that can be employed in applying the Fourth Circuit's J.J. Ryan, and the Court adopts its procedural framework to best give effect to both J.J. Ryan and Broadview.[6]

_____

[6] XO claims that Global NAPS is "not even relevant to" this case because the arbitration language was narrow and because it was governed by Second Circuit, not Fourth Circuit, standards. (Def.'s 2d Arbitration Reply 12). However, as with Broadview, the factual differences between Global NAPS and this case do not foreclose the use of Global NAPS as a persuasive guide about how

### (d)  Dispositive Inquiry

The legal standards for arbitrability are somewhat akin to Russian matryoshka dolls, with every test revealing another sub-test. The first doll, or the threshold inquiry, requires that courts determine whether a valid agreement to arbitrate exists. Chorley Enters., -- F.3d --, 2015 WL 4537969, at *6. If a valid agreement to arbitrate exists, then the second inquiry asks whether the dispute falls within the scope of the agreement to arbitrate. Id. If the claims at issue did not arise directly from the agreement containing the arbitration clauses (e.g., where the claims arise from a tariff rather than an ICA with an arbitration clause), then the third inquiry asks whether the arbitration provision is broad or narrow. J.J. Ryan, 863 F.2d at

---

to approach the problem of tariff-based claims in a relationship where the parties have an ICA which contains an arbitration clause.

XO also implies that, even if Global NAPS is well-reasoned under Second Circuit precedent, it is not persuasive because it is not an application of Fourth Circuit precedent. (Def.'s 2d Arbitration Reply 12). This ignores that Global NAPS was applying a Second Circuit test that is analytically similar to J.J. Ryan (a two-step "broad or narrow? Collateral or related?" inquiry), such that Global NAPS sets a persuasive example of how to procedurally integrate Broadview into any two-step "broad or narrow? Collateral or related?" inquiry.

XO's implication also ignores the Fourth Circuit's deep appreciation for the Second Circuit's arbitration jurisprudence. Indeed, the Fourth Circuit recently reiterated that it recognizes "that the Second Circuit's decisions are 'preeminent in arbitration law.'" E.g., Chorley Enters., -- F.3d --, 2015 WL 4537969, at *6 n.12  (internal citations omitted).

321; Wachovia Bank, Nat'l Ass'n, 445 F.3d at 769; see also Louis Dreyfus Negoce S.A., 252 F.3d at 225; Global NAPS, 2006 WL 1169805, at *8; Broadview Networks, Inc., 19 F.C.C. Rcd. at 22221.[7]

Finally, if the arbitration clause is broad, then "a court must review the factual allegations underlying the particular claim and evaluate the connection between those allegations and the contract containing the arbitration clause" to see if there is a "significant relationship" between the claim and the arbitration clause. Great Am. Ins. Co., 497 F. App'x at 354. In a case where an ICA contains an arbitration provision but the plaintiff pleads claims arising out of tariffs, one way to see whether the dispute is "significantly related" is to see whether the contract containing the arbitration clause incorporated the tariff. Global NAPS, 2006 WL 1169805, at *8; Verizon N.Y. Inc., 5 Misc. 3d at 346; Broadview Networks, 19 F.C.C. Rcd. at 22221.

_____

[7] Although XO spends a fair amount of its Reply pointing out that Verizon has not contested the applicability of any of these preliminary three points of law (Def.'s 2d Arbitration Mem. 1-4, 7-8), there is no reason for Verizon to contest the existence or applicability of these first three tests when Verizon is only disputing the final matryoshka: how to calculate "significantly related." XO states that failure to address points of law and fact mean Verizon has failed to provide meaningful opposition to XO's motion (Def.'s 2d Arbitration Mem. 3), but Verizon's argument can better be characterized as strategic use of its page space to focus on the issue that actually is in dispute.

Other factors relevant to the connection include: (1) whether the relationship that gave rise to the claim and the relationship created by the contract with the arbitration clause were distinct; (2) whether resolution of the claims requires any factual inquiry into the contract containing the arbitration clause; (3) whether the claims could have arisen if the contract with the arbitration clause never existed; and (4) whether the contract with the arbitration clause "created" the relationship which gave rise to the claim. Wachovia Bank, Nat'l Ass'n, 445 F.3d at 768-69. The best way to reconcile J.J. Ryan and Broadview is to treat incorporation of a tariff as a tool to evaluate the existence of a "significant relationship."

Lining up all the relevant tests in narrowing order shows that only the final issue of a "significant relationship" is actually in dispute here. The ICA contains a valid arbitration clause; the dispute does not on its face arise from the ICA; the ICA arbitration clause is broad. Thus, the dispositive issue is whether the factual allegations of Verizon's tariff claim demonstrate a "significant relationship" to the ICA containing the arbitration clause. Great Am. Ins. Co., 497 F. App'x at 354. Incorporation of a tariff into the ICA is one significant tool for evaluating the "significant relationship." See, e.g., Global NAPS, 2006 WL 1169805, at *8; Broadview Networks, 19 F.C.C. Rcd.

at 22221. The other factors will also inform resolution of that issue.

### 2.   Parties' Other Propositions of Law

In addition to disputing the framework for evaluating arbitrability, the parties also dispute three narrower propositions. XO proposes, correctly, that ambiguities in an arbitration clause must be resolved in favor of arbitration. XO proposes, incorrectly, that ICAs necessarily govern all relationships between CLECs and ILECs. Verizon proposes, incorrectly, that the filed rate doctrine prohibits the enforcement of arbitration clauses in ICAs. Each will be assessed in turn.

### (a)   XO's Undisputed Propositions on Resolving Ambiguity

XO makes note of several doctrines calling for, essentially, tipping the scale in favor of arbitration when the language in an arbitration clause is unclear. Verizon does not dispute these doctrines, and they are black letter law, so the Court recites them only briefly.

There is a strong federal policy favoring arbitration. (Def.'s 2d Arbitration Mem. 4) (relying on Green-Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 91-92 (2000)), so that "ambiguities as to the scope of the arbitration clause itself

21

[must be] resolved in favor of arbitration." (Def.'s 2d Arbitration Mem. 4) (relying on Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 476, (1989)). The party resisting arbitration bears the burden of showing that the dispute does not fall within the scope of the arbitration agreement. (Def.'s 2d Arbitration Mem. 4) (relying on Green-Tree, 531 U.S. at 91-92). Arbitration must be compelled "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." (Def.'s 2d Arbitration Mem. 4-5) (relying on United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960)).

### (b) Do ICAs Govern All Interaction between a CLEC and ILEC?

As part of its effort to show that tariff orders "relate" to the ICAs, XO argues that the Telecommunications Act intended that ICAs serve as the tool for CLECs to compete with ILECs, and that, therefore, the scope of an ICA includes everything "necessary for XO to compete in local telephone markets" and interconnect. (Def.'s 2d Arbitration Mem. 9-10). Because tariff purchases are made to interconnect and  because the ICAs make reference to possibly fulfilling ICA obligations by buying at the contract rate, XO concludes that "it does not matter that the ICAs do not formally and explicitly state that Verizon's ...

22

tariffs are 'incorporated by reference' into the ICAs" because the contract language says "related to," and tariffed purchases are purchased in furtherance of the ICAs such that they are therefore "related to" the ICAs such that they are subject to arbitration. (Def.'s 2d Arbitration Mem. 11-13).

XO's argument misses the mark. First, it again ignores that the standard is "significantly related," not merely "related." Second, the Telecommunications Act creates alternatives: CLECs may either order from a tariff or through an ICA, and the act does not express a preference for one or another. U.S. W. Commc'ns, Inc., 275 F.3d at 1250 ("MCI, Sprint and Qwest agree that, under Colorado law, a CLEC has the right to purchase services from an ILEC pursuant to the ILEC's tariffs without negotiating an interconnection agreement."); In the Matter of Implementation of the Local Competition Provisions in the Telecomms. Act of 1996, 11 F.C.C. Rcd. 15499, 15805 (1996) (stating that CLECs that "have the choice of negotiating an interconnection agreement pursuant to sections 251 and 252 or of taking tariffed interstate service.").[8] The purchase orders in

---

[8] Nor does the plain text of the Telecommunications Act support XO's contention. 47 U.S.C. § 251(b)-(c) impose several duties on ILECs, including requirements that they: (1) negotiate in good faith with CLECs about the resale of telecommunications services and about reciprocal compensation for transport and termination of telecommunications; (2) provide interconnection, transmission

dispute might still significantly relate to the ICAs; however, if they do, it is not because the Telecommunications Act makes ICAs the be-all and end-all of a CLEC-ILEC relationship, as XO contends.

### (c) Enforcement of the Filed Rate Doctrine does not Prohibit Arbitration Provisions in ICAs

Verizon argues that the "filed tariff doctrine" prevents enforcement of any agreement which has the effect of altering a tariff, including agreements to arbitrate, because "any carrier's promise to depart from the tariff terms [is] unenforceable." (Pl.'s 2d Arbitration Mem. in Opp'n 9). Verizon offers no decisions directly resolving whether the filed rate doctrine prohibits arbitration of claims arising out of tariffs that would otherwise be subject to the arbitration clauses in an ICA under the J.J. Ryan line of decisions.

---

and routing at reasonable rates; and (3) offer services at wholesale rates to CLECs. Section 252 lays out three ways in which an ILEC may fulfill its § 251 duties: voluntary negotiation, compulsory arbitration, and filing a tariff. However, filing a § 252(f) tariff does not affect the "duty to negotiate": "[t]he submission or approval of a statement under this subsection shall not relieve a Bell operating company of its duty to negotiate the terms and conditions of an agreement under section 251 of this title." § 252(f)(5). By its text, then, the Telecommunications Act characterizes tariffs and ICAs as alternatives, rather than establishing a hierarchy between them. The Act does not establish that, once parties enter a § 252(a)/§ 252(b) ICA, the parties' dealings always relate to the ICA.

"The filed-rate doctrine mandates that 'the rate of the carrier duly filed is the only lawful charge.'" Bryan v. BellSouth Commc'ns, Inc., 377 F.3d 424, 429 (4th Cir. 2004) (quoting AT&T v. Cent. Office Tel., Inc., 524 U.S. 214, 222 (1998)).

> The doctrine's purpose is twofold: to prevent discrimination among consumers and to preserve the rate-making authority of federal agencies .... [A] regulated carrier must charge the tariff rate established with the appropriate regulatory agency.... To do otherwise would be giving a preference to and discriminating in favor of the customer in question.

Id. Verizon argues that the filed tariff doctrine "is not limited to the rates in the tariff, but encompasses all of the associated terms and conditions." (Pl.'s 2d Arbitration Mem. in Opp'n 9) (relying on AT&T, 524 U.S. at 223-24). Verizon accordingly argues that dispute resolution is a tariff term that must be applied uniformly to all customers, so that Verizon could not have enforceably agreed to change the dispute resolution provisions of the tariff for XO, a single customer, any more than it could have enforceably agreed to change prices for XO. (Pl.'s 2d Arbitration Mem. in Opp'n 9; Tr. Sept. 29, 2015 Hr'g 28:19-23). The Court identifies five related reasons to reject Verizon's conclusion.

25

First, Broadview represents a significant hurdle to Verizon's argument. If ICAs could not contain enforceable arbitration provisions, then the FCC could not have blessed the trial court's decision to send the dispute to arbitration in Broadview. Verizon attempts to distinguish Broadview by arguing that, because the ICA incorporated the tariff by reference, sending the parties to arbitration did not violate the filed rate doctrine: because Broadview could only ever order services through the ICA rather than the tariff, the court was sending contract claims to arbitration, not tariff matters. (Tr. Sept. 29 2015 Hr'g 26:11–16, 28:19–24, 29:21–30:1). In Verizon's view, referring to mandatory arbitration unincorporated tariff claims that are merely "significantly related" to a contract alters the rates set in the tariff, because such unincorporated claims are still purely tariff claims under Broadview and an external contract cannot enforceably alter tariff terms. However, contrary to Verizon's characterization, the New York court in Broadview sensibly dismissed the exact argument that Verizon is making here.

> Broadview contends that the reference to the "filed tariff doctrine" dictates that the parties' dispute arose out of the filed tariff(s) and not out of the Interconnection Agreement. Under the filed tariff doctrine, Broadview argues, the terms of a filed tariff exclusively define the relationship .... Broadview asserts that, by deeming the

> parties' dispute to be within the scope of the arbitration provision, the court would be impermissibly interjecting the arbitration provision into the tariff(s)....
>
> The applicability of the arbitration provision to the ... dispute does not depend upon the addition of an arbitration provision to, or the interjection of the provision into, the applicable tariff(s). Rather, effect must be given to the arbitration provision because it is included in the Interconnection Agreement, an agreement separate and distinct from the tariff(s).
>
> Nor has Broadview articulated any basis for a conclusion that the application of the arbitration provision to the dispute would constitute an improper alteration or amendment of the tariff(s). Broadview does not allege that dispute resolution is specifically addressed by the tariffs(s) (cf. [AT & T, 524 U.S. at 225]), or that the arbitration provision conflicts with or challenges any of the terms or conditions which are specifically set forth in the tariff. Rather, the terms and conditions set forth in the tariff(s) remain precisely as they are, and, insofar as they are applicable, will conclusively and exclusively govern the parties' dispute.

Verizon N.Y. Inc., 5 Misc. 3d at *4-6 (emphasis added). In sum, the Broadview court makes the compelling point that an arbitration clause in an ICA modifies the ICA, not the tariff, and the court makes this point without indicating that it would reach any different conclusion if it had not already decided that the ICA incorporated the tariff by reference. The Broadview court considered the same argument that Verizon is making here,

27

and nevertheless packed the parties off to arbitration. The FCC noted the New York court's rejection of Broadview's argument without additional comment or analysis. Broadview Networks, 19 F.C.C. Rcd. at 22220 (stating simply that "the Court rejected Broadview's contention that enforcement of the arbitration provision would violate the filed tariff doctrine").

Second, the FCC takes the view, as a general principle, that arbitration clauses in ICAs should be enforced. Broadview Networks, 19 F.C.C. Rcd. at 22223 ("the Commission has expressed a strong interest in encouraging compliance with interconnection agreements, including deference to valid forum-selection provisions contained in interconnection agreements."). That certainly tells that the FCC believes such provisions are enforceable.[9]

Third, it is also a misreading of AT&T for Verizon to state that the filed tariff doctrine "is not limited to the rates in the tariff, but encompasses all of the associated terms and conditions." (Pl.'s 2d Arbitration Mem. in Opp'n 9). In AT&T, company literature and an AT&T corporate representative promised

_____

[9] The filed rate doctrine is a "century-old," but was included in the Telecommunications Act at 47 U.S.C. § 203(a). AT&T at 222. The FCC is tasked with administering the Telecommunications Act, and this Court gives Chevron deference to its interpretations of the Act.

Central Office certain "additional services and guarantees" not included in the tariff, "viz., faster provisioning, the allocation of charges through multilocation billing, and various matters relating to deposits, calling cards, and service support." AT&T, 524 U.S. at 224-25. Central Office sued over breach of those non-tariff promises. Id. at 220. Although the Ninth Circuit "thought the filed rate doctrine inapplicable '[b]ecause this case does not involve rates or ratesetting, but rather involves the provisioning of services and billing,'" the Supreme Court instead held that "non-price features" are covered by the filed rate doctrine. Id. at 223 (citation to Ninth Circuit omitted). In so doing, the Supreme Court noted that "discriminatory 'privileges' come in many guises ... [A] preference or rebate is the necessary result of every violation ... where the carrier renders or pays for a service not covered by the prescribed tariffs." Id. at 224 (internal citations omitted). To support its reasoning, the Court cited to two earlier railroad cases in which a customer had contracted for an especially fast train not specified in the tariffs or contracted for use of train cars on a particular day not specified in the tariff. Id. (noting Davis v. Cornwell, 264 U.S. 560 (1924); Kansas City S. R. Co. v. Carl, 227 U.S. 639 (1913)).

Verizon quotes AT&T for the proposition that "the filed tariff doctrine is not limited to the rates in the tariff, but encompasses all of the associated terms and conditions." (Pl.'s 2d Arbitration Mem. in Opp'n 9). However, AT&T clearly only contemplates privileges that alter the tariffed service – when, where, and what is provided – not every associated term or condition. In other words, there is a distinction between terms and conditions associated with providing the tariffed service and terms and conditions associated with dispute resolution. Although the filed rate doctrine prohibits contracting to provide non-tariffed rates for a tariffed service, or contracting to provide a non-tariffed service for a tariffed rate, dispute resolution terms do not equate to the type of discriminatory "privileges or facilities" contemplated by the filed rate doctrine.

Fourth, sending this dispute to an arbitrator will not impermissibly alter the tariffed rate. Rather, it merely results in an arbitrator telling the carrier whether the carrier has been applying rates correctly. See P.R. Tel. Co., Inc. v. WorldNet Telecomm., Inc., 52 F. Supp. 3d 370, 383 (D.P.R. 2014) ("This [arbitration] ruling had nothing to do with the 'validity' of any tariff, and it invalidated charges under the tariff only insofar as it held that PRTC had long been

30

overcharging"). An arbitration clause does not alter orders under a tariff. It merely changes where the parties go when they require interpretation of the tariff.

Fifth and finally, courts have enforced arbitration clauses in other tariffed industries. For example, in Duke Power v. F.E.R.C., 864 F.2d 823, 825 (D.C. Cir. 1989), two power companies included an arbitration clause in their interconnection agreement. One of the companies brought a complaint against Duke Power before the Federal Energy Regulatory Commission, alleging that Duke Power was charging an amount other than the filed rate in contravention of the interconnection agreement. Id. The Commission found that Duke Power had indeed violated the filed tariff doctrine, and retained jurisdiction over the dispute rather than sending it to arbitration, because the Commission believed that submitting the dispute to arbitration would be a waste of time and resources. Id. at 825-26. The United States Court of Appeals for the District of Columbia Circuit held that the Commission was not required to submit the dispute to arbitration because "[t]he assistance of an arbitrator was ... neither required nor necessary to interpret the rate schedules." However, the court noted that the Commission might enforce the arbitration clauses in its discretion. Id. at 831. The court also stated that

31

> [i]n so holding, we do not give the
> Commission a license to disregard the
> mandatory arbitration clauses in routine
> contract disputes ... The facts of this case
> constitute an exception ... because although
> "the Natural Gas Act permits the relations
> between the parties to be established
> initially by contract, the protection of the
> public interest [is] afforded by supervision
> of the individual contracts, which to that
> end must be filed with the Commission and
> made public[.]" ... In short, because the
> Commission has an independent interest as a
> regulatory body in prohibiting utilities
> from charging other than their filed rates,
> Duke's violation of the interconnection
> agreements effectively converted the ...
> dispute from one between Duke and
> complainants to one between Duke and the
> Commission. Our decision today ... not to
> order arbitration therefore derives entirely
> from the Commission's duty to enforce filed
> rate schedules.

Id. (emphasis added). In sum: arbitration clauses in interconnection agreements are enforceable, although when the underlying dispute alleges violations of a filed tariff in front of an agency, the unique interests of the agency may allow the agency to retain jurisdiction over a dispute which otherwise arises from a mandatory arbitration clause. In this case, there are no allegations that XO has violated the filed rate doctrine. Additionally, the Court does not have the same duties and interests as an agency, and lacks an agency's basis for retaining jurisdiction over an otherwise arbitrable dispute.

Instead, this case is one of the "routine contract disputes" that cannot escape an ICA's arbitration clause.

For the foregoing reasons, the Court declines to find that the filed rate doctrine precludes parties from placing enforceable arbitration provisions in ICAs.

## B.    Application of Governing Law

The Court applies Great Am. Ins. Co., Wachovia, and Broadview to "review the factual allegations underlying" Verizon's claims and "evaluate the connection between those allegations and the" ICAs containing the arbitration clause. Great Am. Ins. Co., 497 F. App'x at 354.

### 1.    Wachovia Points of Interest

Wachovia did not create a set list of factors for evaluating "significantly related," but it is nonetheless helpful to look at the facts that the Wachovia court found important in evaluating the relationship between the claims asserted in the complaint and the contract with an arbitration clause.

First, Wachovia examined whether the relationship that gave rise to the claim and the relationship governed by the arbitration clause were "separate." Here, unlike in Wachovia, the relationship that gave rise to the claim and the relationship created by the ICA is one and the same: the CLEC-

33

ILEC relationship. This factor very strongly points to a significant relationship.

Second, Wachovia examined whether resolution of the claims would require reference to the contract or relationship governed by the arbitration clause. In this case, that factor depends on the claim. XO has identified Verizon's claims at ¶¶ 96-98 and ¶¶ 102-104 as subject to arbitration. (Def.'s 2d Arbitration Reply 19). According to the Complaint, Verizon's claims based on XO's failure to pay transportation costs arise out of the California ICA (Compl. ¶ 102-104), so that resolving the California dispute would require reliance on the ICA. However, ¶¶ 96-98 states claims under the state tariffs (Compl. ¶¶ 96-98) and should not require reference to the ICAs.

Wachovia also inquired whether the claims would have arisen if the contract including the arbitration clause had never existed. As to the transport claims at ¶¶ 102-104, if the claims were created by the ICA, then this factor weighs in favor of arbitration. If the claims were created by the 2007 Settlement Agreement, then this factor weighs against arbitration. Examining the 2007 Settlement Agreement, the effect of which is discussed more fully in the following section, the transport obligations clearly pre-date the 2007 Settlement Agreement and originate in the California ICA. (2007 Settlement Agreement 4)

("the Effective ICA in the state of California ... provides that each Party, at its own expense, shall provide transport facilities to the technically feasible Point(s) of Interconnection"). The transport claims in ¶¶ 102-104 would not have arisen if the ICA did not exist.  That weighs in favor of arbitration for these transport claims. As to the state tariff claims in ¶¶ 96-98, XO stated in oral argument that the "only reason" it purchases anything from Verizon is to effectuate the purposes of the ICA, and that there was "no possible way" that XO would have purchased the services at issue if the ICA never existed. (Tr. Sept. 29, 2015 Hr'g 10:1-4, 20:11-20) (relying on Docket No. 73, Ex. 2, Decl. of Richard Jackson). The claims would not have arisen if the ICA did not exist. That weighs in favor of arbitration for the state tariff claims in ¶¶ 96-98.

Finally, Wachovia asked whether the arbitration clause "created" the relationship that gave rise to the claim. As discussed previously, the Court rejects XO's contention that the Telecommunications Act necessarily makes all ILEC-CLEC transactions "significantly relate" to an ICA, and finds that the breadth of an ILEC-CLEC relationship under the Telecommunications Act was not dispositive to the issue of significant relation. However, the breadth of the ICA and its importance in the CLEC-ILEC relationship is still highly

relevant to finding a significant relationship. (Tr. Sept. 29, 2015 10:1-4, 20:11-20) (relying on Docket No. 73, Ex. 2, Decl. of Richard Jackson).

In sum, the Wachovia factors clearly indicate that the disputes asserted in the Complaint that arise out of the ICAs (e.g., Compl. ¶¶ 102-104) should be arbitrated. The Wachovia factors are less clear on the claims arising out of intrastate tariffs (Compl. ¶¶ 96-98). These claims arise out of the same relationship as the ICA and the ICA is a cornerstone of the relationship that led to the claims, but the claims could be resolved without reference to the ICA and XO could feasibly have placed orders under the intrastate tariffs even if the ICA had never existed. As a practical matter, however, the Court accepts the uncontested representations in the Declaration of Richard Jackson that, but for the ICAs, XO would not actually have placed the current orders. Given this but-for relationship, the Court finds that the Wachovia factors point in favor of referring the California, Texas, and Florida claims to mandatory binding arbitration.

### 2.Broadview

XO argued that ICAs "incorporate" tariffs in its first round of briefing. However, it abandoned that argument in the current round, instead taking the tack that "[i]ncorporation of

36

tariffs by reference is irrelevant to XO's Renewed Motion." (Def.'s 2d Arbitration Mem.; Def.'s 2d Arbitration Reply 3). The Court, then, accepts Verizon's contention that the ICAs do not incorporate the tariffs by reference (Pl.'s 2d Arbitration Mem. in Opp'n 8), a view that is adequately supported by Verizon's exhibits. (Pl.'s 2d Arbitration Mem. in Opp'n, Ex. 1–8). Under Broadview by way of J.J. Ryan, non-integration is a factor indicating that the tariff claims are not "significantly related" to the ICA.

## C.    Conclusion

Unfortunately, this leaves the Court with Broadview pointing in one direction and Wachovia pointing in another. While the Court should resolve all ambiguities in the arbitration clause language itself in favor of arbitration, the Court is already reading the ICA arbitration language broadly. The remaining ambiguity is a question of applicable law, not of arbitration clause interpretation: which facts carry more weight for determining "significant relat[ion]" – the facts the Fourth Circuit held important for arbitration of typical commercial relationships in Wachovia, or the fact the FCC held important for arbitration of tariff disputes in Broadview?

Specific terms prevail over broad terms in statutory interpretation and in contracts, e.g., Radzanower v. Touche Ross

& Co., 426 U.S. 148 (1976) (discussing statutory interpretation); Lufthansa Sys. Infratec GmbH v. Wi-Sky Inflight, Inc., 894 F. Supp. 2d 677 (E.D. Va. 2012) (discussing contract interpretation), but this jurisprudential rule does not necessarily extend to the proposition that "rules for specific and technical areas of law prevail over rules for broad areas of law" such that Broadview necessarily trumps Wachovia. Additionally, the "all ambiguities in arbitration clause language must be resolved in favor of arbitration" rule of Warrior & Gulf Navigation Co., 363 U.S. at 582-83, applies to resolving ambiguities in a contract, not to ambiguities between which law should prevail.

However, the strong federal policy favoring arbitration over court litigation, CompuCredit Corp. v. Greenwood, -- U.S. --, 132 S. Ct. 665, 669 (2012), suggests that ambiguous questions of law should also be resolved in favor of arbitration. The strong federal policy favoring arbitration allows XO to prevail on its motion to compel arbitration, subject to the legal force of the 2007 Settlement Agreement.

## EFFECT OF THE 2007 SETTLEMENT AGREEMENT

The 2007 Settlement Agreement settled a variety of disputes between Verizon and XO, including disputes over certain

38

enumerated California services. (2007 Settlement Agreement 1-2). The 2007 Settlement Agreement's dispute resolution clause explicitly allows the parties to "pursue any remedies available ... at law, in equity, or otherwise, including, but not limited to, instituting an appropriate proceeding before ... a court of competent jurisdiction" to resolve "any dispute between the parties regarding the interpretation or enforcement of this Agreement or any of its terms." (2007 Settlement Agreement 9).[10]

XO makes two arguments: that the 2007 Settlement Agreement does not displace the ICA and the ICA's arbitration agreement, and that the 2007 Settlement Agreement does not cover the claims XO wants to send to arbitration. Neither is correct.

---

[10] The contract is governed by Virginia law to the extent that Virginia law is not preempted by federal law. (2007 Settlement Agreement 10). The Settlement Agreement actually requires that any dispute governed by the 2007 Settlement Agreement be brought in the "federal or state court of competent jurisdiction in or nearest to Fairfax County," (2007 Settlement Agreement 10), which is the Alexandria Division of the Eastern District of Virginia rather than the Richmond Division. If the claims at ¶¶ 102-104 arose out of the 2007 Settlement Agreement, as Verizon claims, then XO might have challenged venue in its original round of pleadings. However, a party must make all its Rule 12 motions at once. Fed. R. Civ. P. 12(g) ("a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."). Having presented a motion under Fed. R. Civ. P. 12(b)(6), XO has waived its ability to make a motion under Fed. R. Civ. P. 12(b)(3) at this stage in the proceedings.

First, XO argues that the 2007 Settlement Agreement permits the parties to go to court rather than affirmatively denying them the ability to go to arbitration, such that the arbitration requirement in the earlier ICA still governs. (Def.'s 2d Arbitration Mem. 16) (relying on Warrior & Gulf Navigation Co., 363 U.S. at 582-83 ("An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.")). Warrior & Gulf is not actually on point.  Instead, that case dealt with interpreting ambiguities in the scope of an arbitration clause in a single contract, not the question of whether expressly permitting resort to the courts in a subsequent contract trumps an arbitration clause in an earlier contract. Id. In a more applicable case, the Fourth Circuit recently rejected an argument similar to the one that XO presents.  The Fourth Circuit found that, when one clause expressly reserves the right to go to court over a specific group of claims, but a different and more general clause makes arbitration mandatory, the specific provision leaving recourse to the courts open prevails.  Chorley Enters., -- F.3d --, 2015 WL 4637967, at *9-11. This case is different than Chorley in that the 2007 Settlement Agreement's dispute provision is not

40

necessarily more specific than the general arbitration clause in the ICA. However, Chorley still demonstrates that XO's reading of Warrior & Gulf is incorrect: an arbitration clause may be defeated by a clause permitting but not mandating recourse to the courts in another clause.

In deciding whether the ICA or the 2007 Settlement Agreement controls, Verizon also points out that a later agreement controls over an earlier agreement, particularly when the later agreement explicitly states that it supersedes earlier agreements. (Pl.'s 2d Arbitration Br. 12-13) (relying on National R.R. Passenger Corp. v. ExpressTrak, L.L.C., 330 F.3d 523, 529-31 (D.C. Cir. 2003) ("Because the Sublease came later" the sublease controlled, and the "district court erred by applying the arbitration clause of the [earlier] Operating Agreement, rather than the litigation clauses of the leases")).

The 2007 Settlement Agreement's dispute resolution clause is last in time relative to the California ICA. And, the 2007 Settlement Agreement contains an integration clause. Under Chorley and ExpressTrak, the 2007 Settlement Agreement's "supersedes" language accordingly is to be read to allow Verizon to bring the California disputes to court, but only if Verizon's claims actually arise from duties created in the 2007 Settlement Agreement.

41

This leads to XO's second contention: that the 2007 Settlement Agreement's dispute resolution language only applies to the one-time payment obligation created by the 2007 Settlement Agreement, and that the parties put the dispute resolution language in the Settlement Agreement because it was unclear whether the broad dispute resolution clauses in the ICAs would cover the one-time payment obligation. (Def.'s 2d Arbitration Mem. 14-15). The Court must, accordingly, examine the Complaint and the 2007 Settlement Agreement to decide whether any claims in the Complaint are also subject to the 2007 Settlement Agreement and that Agreement's litigation clause.

XO alleges specifically that the claims in ¶¶ 102-04 of the Complaint are subject to the California ICA. (Def.'s Consolidated Mem. 17). The Complaint states that

> 102. Under the California interconnection agreement between Verizon and XO, XO is responsible for the costs of the transport facilities used to route traffic from its facilities to its chosen point of interconnection on Verizon's network. See California Agreement, § 4.2.

> 103. In the 2007 Settlement Agreement, Verizon and XO clarified their understanding of XO's responsibilities under the California Agreement. 2007 Agreement, § 2(d)(iv) ("The Parties acknowledge and agree that the Effective ICA in the state of California (as amended, including pursuant to the settlement agreement between the Parties as of October 21, 2004) provides that each Party, at its own expense, shall

>                provide    transport    facilities    to    the
>                technically    feasible    Point(s)    of
>                Interconnection.") ....
>
>                104. XO owes Verizon for the proportion of
>                the facilities used to deliver traffic from
>                XO to Verizon's point of interconnection.

(Compl. ¶¶ 102-04). However, as XO points out, the heading for

this section in the Complaint is "XO's Repeated Breaches of the

Interconnection Agreements." (Def.'s 2d Arbitration Reply 15).[11]

The 2007 Settlement Agreement states that

>                Whereas, the parties have (or may hereafter
>                have) disputes regarding the amounts that
>                are owed by Verizon to XO for the transport
>                and termination of Verizon-originated local
>                traffic    (including    non-optional    EAS
>                traffic), reciprocal compensation traffic
>                and intraLATA switched access traffic, in
>                ... California ... from the beginning of
>                time through (and including) July 31 2007
>                ... (such dispute, the "Usage Dispute")...
>
>                Whereas, the Parties have (or may hereafter
>                have) disputes regarding the amounts that
>                are    owed    by    Verizon    to    XO    for
>                local/intraLATA    interconnection    transport
>                facilities    in    California    ...    from    the
>                beginning of time through (and including)
>                July 31, 2007 (such dispute, the "Facilities
>                Dispute")...
>
>                Whereas the parties have (or may hereafter
>                have) disputes regarding the amounts that
>                are    owed    by    XO    to    Verizon    for
>                local/intraLATA    interconnection    transport

---

[11] The Amended Complaint, just like the Complaint, states that
the claim is based in breach of the interconnection agreement,
and cites to the California Agreement. (Am. Compl., Docket No.
70, ¶¶ 102-04).

> facilities in California ... from the
> beginning of time through (and including)
> July 31, 2007 (such dispute, the "California
> Facilities Dispute").
>
> Whereas, the Parties have (or may hereafter
> have) disputes regarding liability for
> certain taxes, surcharges, and late payment
> charges arising out of amounts allegedly
> owed in connection with the ... California
> Facilities Dispute ... (such disputes, the
> "Additional Charges Dispute")...
>
> Whereas, the Parties wish to resolve and
> settle ... the Usage Dispute, the Facilities
> Dispute ... the California Facilities
> Dispute and the Additional Charges Dispute
> ...

(2007 Settlement Agreement 1-2). The 2007 Settlement Agreement
then recites several payments and credits between the parties,
and several agreements about the parties' responsibilities under
existing ICAs. (2007 Settlement Agreement 2-5). The
"Acknowledgements and Reconciliations" section states that

> (iv) The Parties acknowledge and agree that
> the Effective ICA in the state of California
> ... provides that each Party, at its own
> expense, shall provide transport facilities
> to the technically feasible Point(s) of
> Interconnection.
>
> (v) The Parties agree to continue in good
> faith the process of reconciling each
> Party's respective records of XO
> local/intraLATA interconnection trunk
> facilities in order to determine and agree
> upon the identity of the circuits that exist
> and the charges that should be billed.
> Verizon acknowledges that certain of such
> facilities have been validated and
> reconciled, and that it is required to pay

44

> such amounts as may be undisputed and due in
> accordance with the terms of the applicable
> Effective ICA.
>
> (vi) The Parties agree to engage in good
> faith the process of reconciling XO's
> billings to Verizon for local and intraLATA
> toll usage, in order to prevent, so far as
> possible, disputes similar to the Usage
> Dispute from arising in the future.

(2007 Settlement Agreement 4). The 2007 Settlement Agreement clearly goes beyond merely requiring a one-time payment, and instead creates substantive legal rights and duties. Thus, XO's second argument also fails.

The Court finds that all claims whose terms or payment were subject to the 2007 Settlement Agreement are not subject to the arbitration provision of the California ICA, because they have been removed from the scope of the California ICA's arbitration clause by the specific and subsequent dispute resolution clause of the 2007 Settlement Agreement, per Chorley and ExpressTrak.

In that regard, the Court notes that Verizon's claim in ¶¶ 102-104 of the Complaint, over money owed "for the proportion of the facilities used to deliver traffic from XO to Verizon's point of interconnection," is quite clearly subject to paragraph (iv) of the 2007 Settlement Agreement's Acknowledgements and Reconciliations, and accordingly is not subject to binding arbitration. Claims stemming from "transport and termination of Verizon-originated local traffic (including non-optional EAS

45

traffic), reciprocal compensation traffic, and intraLATA switched access traffic," "local/intraLATA interconnection trunk facilities," and "local and intraLATA toll usage" are also clearly subject to the 2007 Settlement Agreement, and accordingly are not subject to binding arbitration. The claims in ¶¶ 96-98 of the Complaint also appear to be covered by the 2007 Settlement Agreement. [12]

The Court recognizes that referring Texas claims, Florida claims, and any identified California claims to arbitration will result in an awkward division of claims. The FAA both acknowledges and accepts this inefficiency, and the Court is not free to rewrite the parties' contracts to ensure efficient litigation. Chorley Enters., Inc., -- F.3d --, 2015 WL 4637967, at *8-9 (quoting KPMG LLP v. Cocchi, -- U.S. --, 132 S.Ct. 23, 26 (2011) (per curiam) ("[W]hen a complaint contains both arbitrable and nonarbitrable claims, the Act requires courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be

---

[12] XO contends that the claims in ¶¶ 96-98 of the Complaint are not covered by the 2007 Settlement Agreement. On this record, that contention does not bear out. If, however, discovery should disclose some basis for believing that a claim within ¶¶ 96-98 is not covered by the 2007 Settlement Agreement, the arbitrability of that claim can be addressed later.

the possibly inefficient maintenance of separate proceedings in different forums.")).[13]

## CONCLUSION

For the foregoing reasons, the RENEWED MOTION TO COMPEL ARBITRATION (Docket No. 57) will be granted as it relates to the Texas and Florida claims, but will be denied as it relates to any California claims which were also the subject matter of the 2007 Settlement Agreement.


It is so ORDERED.

_____ /s/

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: November  5 , 2015

---

[13] Of course, the parties can eschew rights to arbitrate the Florida and Texas claims and have them promptly settled in the trial of this case.